## Commonwealth *v.* Silcox, Appellant.

*Criminal law—Murder—Presence of defendant—Amendment of record.*

On an indictment for murder the record must show affirmatively that the prisoner was present at every stage of the proceedings against him; but if through an omission of the clerk the fact of his presence was not noted on the record, the trial court may direct that the record shall be amended so as to conform to the actual facts of the case, and show the presence of the prisoner.

*Murder—Evidence—Dying declarations.*

On the trial of an indictment for murder, the dying declarations of the deceased are admissible in evidence, where the witness to whom they were made testifies that the deceased was " in his right mind," and conscious that his death was imminent at the time he made them.

*Evidence—Contradictory statements—Charge of court.*

On the trial of an indictment for murder, it is improper for the court to refuse to charge that if the jury believe the testimony of certain witnesses, "that the deceased made declarations at the time of the shooting and subsequently thereto that the shooting was accidental, and contradictory of his dying declarations, such declarations are to be taken into consideration by the jury, and if true then there should be an acquittal."

*Murder—Charge of court.*

On the trial of an indictment for murder, it is not improper to charge that, "while justice is to be tempered with mercy, you will see to it in your deliberations that your compassion for the accused shall not work wrong and injustice to the commonwealth. The deceased was, and all citizens who survive him are, as much entitled to the protection of the law as the prisoner at the bar."

*Murder of the second degree—Charge of court.*

On an indictment for murder it is proper to charge: "If all the evidence in the case proves to the satisfaction of your minds beyond a reasonable doubt that the defendant, in cool blood, not in the heat of a passion, not demented by gross intoxication, shot the deceased and thereby inflicted upon his leg a wound, which wound accelerated or caused blood poisoning to set in, killing or causing the death of the deceased five days after such shooting, then you might find the defendant guilty of murder of the second degree."

*Manslaughter—Charge of court.*

On an indictment for murder it is proper to charge: "If you find from the evidence, beyond a reasonable doubt, that the defendant did, upon a sudden quarrel or provocation and without malice, shoot and wound the deceased, that such shooting and wounding caused blood poisoning to set in, and that from such disease he died on the fifth day after the shooting, then the offence would be manslaughter, and your verdict would be accordingly—all other requirements of fact and law, as we have or will instruct you, being made out."

*Murder—Inadequate statement of defendant's case.*

A judgment of guilty on an indictment for murder will be reversed, where the trial judge gives due prominence to the evidence on the part of the commonwealth but fails to bring to the attention of the jury evidence on behalf of the defendant which tended to show the existence of intimate and friendly relations between the deceased and the accused, and their declarations and conduct immediately after the shooting which tended to negative an inference of ill will or a quarrel between them at the time of the shooting.

Argued March 2, 1894. Appeal, No. 164, Jan. T., 1894, by defendant, William Silcox, from judgment of O. & T. Montour Co., on verdict of guilty of manslaughter. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Indictment for murder.   Before IKELER, P. J.

At the trial it appeared that, on May 4, 1893, the prisoner shot Franklin Gallagher in the leg, and that five days afterwards Gallagher died from the wound.   At the time of the shooting it appeared that both the deceased and the prisoner had been drinking, and evidence for the prisoner tended to show that they were close friends.

When Thomas Macaffery, a witness for the Commonwealth, was on the stand, he was asked : " Q. State whether or not Frank Gallagher knew his condition.   A. He did Thursday morning, yes, sir.   Q. What did he say to you ?   A. I says to him on Thursday morning, about, I guess, in the neighborhood of six o'clock, he says to me : ' Tom, I am gone.'   Q. What did he mean by that, do you know ?   [Objected to.]   Q. What followed ?   A. Then I asked him, I says : ' Frank, how does' this happen ? '   [Objected to.]   Q. The night before that time did Frank Gallagher realize his condition, do you know ?   A. About three o'clock in the morning, when the puddlers' whistle was blown, yes sir, on Thursday morning, the day he died.   He died in the evening five minutes till eight, he came to his senses about three.   We took notice to it first hearing the puddlers' whistle.   Q. Did you or not think he was dying at any time through that night ?   A. Yes, sir.   Q. State to the court and jury his condition between two o'clock Thursday morning and four.   A. In the neighborhood of about four o'clock he kind o' fainted away that we called the whole family up, thought he was gone, that he was dead.   That was Thursday morning about four o'clock as near as I can tell.   Q. What was the first expression that Frank made to you after he came to ?   A. The first he made to me after he came to, he says : ' I believe I am gone, Tom.'   That was a good while after though— in the neighborhood of two hours may be afterwards, or more."

Defendant objected because the commonwealth had not laid sufficient ground upon which to introduce the declarations of a dying man as his dying declarations or as testimony in this case.   Objection overruled, exception. [12]

' "Q. Now state to the court and the jury exactly what was said by Frank Gallagher.   A. I said to him : ' Frank, how did this happen ? '   He says : ' I went out with Silcox, and we went in, and Silcox put some meat on the stove to fry, and the cat

started to run round, and I said I would either feed those cats or shoot them, and he says, Gallagher, you insult me and I will shoot you. And I got up and went to the door and got my coat and put it on, and I turned round to get my hat, and Silcox came downstairs and let fly.' "

The court charged in part as follows:

" This painfully interesting case is now drawing to a close, and is about to be submitted to you upon the facts as developed by the evidence and the law as declared by the court, in order that you may pronounce a verdict between the commonwealth and the defendant. It is no doubt a serious and painful duty to you; but you must not shrink from the task, regardless of whether you will receive the approval of one class of men of the community or the condemnation of another. Every fair-minded person who has witnessed the trial must be satisfied of its fairness, regularity and impartiality up to the present time, let his own opinion of the merits of the cause be as it may. And I am sure that nothing which is left to be done by you will impair its general character. [While justice is to be tempered with mercy, you will see to it in your deliberations that your compassion for the accused shall not work wrong and injustice to the commonwealth. Frank Gallagher, the deceased, was—and all citizens who survive are—as much entitled to the protection of the law as is the prisoner at the bar ; ] [2] and in considering the evidence and in determining this case, you will lay aside all sympathy for the one side or for the other. Let love, hate, passion or feeling be banished from your minds ; be guided and governed in your decision by the pure, high and noble motive of observing the law and arriving at the truth according to the evidence. If you discharge your duty conscientiously—as we have no doubt you will—whether your verdict be popular or unpopular, you may defy the censure of those whom it may displease, as I know you would disregard the applause of those whom it may please. In performing my duty I have and will conscientiously regard the oath which obliges me to faithfully and impartially administer the laws according to my best skill and judgment. And in discharging yours you will have due regard to that oath which imposes upon you the obligation well and truly to try the cause between the commonwealth and the prisoner at the bar, according to

the law and to the evidence, which has been given you in the case.

"The defendant, William Silcox, stands charged in this indictment with the crime of murder. The district attorney, with the consent of the court, has withdrawn the charge of murder of the first degree and asks only for conviction of murder of the second degree or of voluntary manslaughter, either of which you may find if the evidence warrants it. The unlawful killing of a person otherwise than by means of poison or of lying in wait or by any other kind of willful, deliberate and premeditated killing—but with malice suddenly produced —is murder of the second degree. Manslaughter is the unlawful and felonious killing of another without malice either express or implied. Where, upon a sudden quarrel, two persons fight and one kills the other, it is manslaughter; so if a man be greatly provoked by gross indignity and immediately upon the first transport of passion kills his aggressor, it is manslaughter. In these and such like cases, the law kindly appreciating the infirmities of human nature, extenuates the offence committed and mercifully hesitates to put upon the same footing of guilt the cool, deliberate act and the result of hasty passion and action. Manslaughter lies where the injury producing death was inflicted with a design and purpose to kill. But only in the heat of passion or without malice. It also lies where death results unintentionally, so far as the defendant is concerned, from an unlawful act on his part. The law of this state punishes the first offence of murder of the second degree with imprisonment by separate and solitary confinement at labor not exceeding twenty years, and voluntary manslaughter by imprisonment by separate and solitary confinement at labor (or by simple imprisonment) not exceeding twelve years—in the discretion of the court—and by a fine not exceeding one thousand dollars, and demands security for good behavior during life or for any less time, according to the nature and enormity of the offence.

"Under this indictment, if the evidence warrants it—as explained in our instructions—you may find the defendant guilty either of murder of the second degree or of voluntary manslaughter; or you may find the defendant not guilty.

"[If all the evidence in the case proves to the satisfaction

of your minds beyond a reasonable doubt that the defendant, in cool blood, not in the heat of passion, not demented by gross intoxication, shot the deceased and thereby inflicted upon his leg a wound, which wound accelerated or caused blood poisoning to set in, killing or causing the death of the deceased five days after such shooting and wounding, then you might find the defendant guilty of murder of the second degree.] [3]

" [If you find from the evidence, beyond a reasonable doubt, that the defendant did, upon a sudden quarrel or provocation and without malice, shoot and wound the deceased, that such shooting and wounding caused blood poisoning to set in, and that from such disease he died on the fifth day after the shooting, then the offence would be manslaughter, and your verdict would be accordingly—all other requirements of fact and law, as we have or will instruct you, being made out.] [4]

" If you have any reasonable doubt arising on and from all the evidence in the case, as to the defendant being guilty either of murder of the second degree or of manslaughter, as we have already explained them to you, then you should simply find the defendant not guilty.

We instruct you that malice, within the meaning of the law, includes not only ill-will, anger, hatred and revenge, but is implied in the doing of any action flowing or following from a wicked and corrupt motive—from any deed done with a wicked mind, attended with such circumstances as plainly indicate a heart regardless of social duty and fully bent on mischief ; hence malice is implied from any deliberate and cool act committed against another, however suddenly performed, which shows an abandoned and malignant heart.

[Now, as to the facts in this case : On the sixth day of May last, it appears from the testimony, if you believe the witnesses, that Frank Gallagher left his home in this borough of Danville at about three or four o'clock in the afternoon and went out upon the streets, and upon Mill street met the defendant Silcox and perhaps others.    That Gallagher and Silcox drank together.    That at one place drink was refused Silcox, who offered in payment bread tickets ; but that he subsequently procured a pint of liquor, a portion of which—if we recollect aright—and if we mis-recite any part of the testimony, we ask to be corrected—was drunk and the rest taken by Silcox to his

house, whither he was accompanied by the deceased; that upon
the afternoon or evening of that day the report of a gun was
heard by the neighbors or by persons being at the time near the
house of Silcox; that Gallagher came out of Silcox's house and
went into the house (adjoining) of Edward—Ted or Teddy as
the witnesses say—Lewis, where he said that he had been shot
or that he was hurt; that persons, upon hearing that report,
approached, saw that the deceased was wounded, helped him
to a chair or in a position to have his leg washed; and that a
physician was sent for. Hollister testifies to washing the leg
and Mrs. Beddoeta that she brought water for that purpose.
These witnesses (and others) testify as to their care for the
wounded man, and the physicians who attended him describe
his condition. Dr. Kimmerer, who dressed the wound and had
charge of the patient till his death, and who was present at the
autopsy or post-mortem examination of the body of the deceased,
underwent a thorough examination in chief and an especially
searching cross-examination as to the wound, his treatment of
the patient, the progress of the disease, septicæmia or blood
poisoning, and the state of the thoracic and of the abdominal
viscera after death. Drs. Thompson and Voorhees also de-
scribed these matters, or some of them. Dr. Curry was called,
but he merely acted as recorder of the autopsy. All the physi-
cians who took part in the actual post-mortem examination of
the remains had also been in consultation on the patient's case
before his death; and they practically agree that he died from
septicæmia, that is, blood poisoning, superinduced by this gun-
shot wound, or this wound as they describe it—as if made by
shot or some round bodies from a gun. In fact the witnesses for
the defense have proved to you, and counsel on behalf of the
defendant admit, that it was a gunshot wound that was received
by the deceased. They prove the kind of gun—a single-barrel,
breech-loading shot-gun. No doubt the missile discharged from
the gun was shot. The gun had been loaned at some time pre-
vious to a stepbrother or half-brother; who, after he was done
using it, carried it (loaded with a shell) to his home, and whose
mother carried it to the house of Silcox a few days or a short
time before this unfortunate occurrence took place. The de-
fendant's evidence, if believed, shows that the gun was placed,
still loaded, in the back part of his house, and we think between
the cupboard and the stairway.

" How did that shooting occur? Did the gun remain where the mother had put it from the time she placed it there until the evening of the sixth of May, when it was discharged? Was this the gun that was discharged? How did it come to be pointed at the leg of Gallagher? The gun went off; the report was heard; Gallagher wounded, came or was assisted into the house of Lewis, and was there (in the care of friends) attended by Dr. Kimmerer, and was thence removed to his home.

" [While at Lewis's persons gathered around him, and it is alleged that he made remarks as to the manner of the shooting. But the commonwealth was not permitted to give in evidence as his dying declaration anything said by Gallagher until on the day of his death,] [6] Thursday, May 11th; he dying at about eight o'clock on the evening of that day. Witnesses speak of his condition from the sixth to the eleventh, day by day; and P. H. Macaffrey says that on Monday, the 8th, he seemed to be suffering a great deal of pain ; that he was rational, though, and talked sensibly. He also says: ' On Sunday evening he told me that he was not going to get well. But on Monday evening he told me that he felt a great deal worse.' He testified that Gallagher at times during his sickness was rational ; but most of the time unconscious and flighty, and not in his right mind.

" On Thursday, the 11th day of May (as we recollect the testimony of Macaffrey) Gallagher fainted or sank away, and he, Macaffrey, thought that life had departed or that Gallagher was about to die, and the family was called to the bedside ; but the patient recovered from the fainting fit and, while he was sensible and in his right mind, was asked how this happened, how this shooting occurred, how it came about. But the witness states that before he asked him this Gallagher had said : ' Tom, I believe I am gone.' The other Macaffrey says that some time previous to this Thursday when he died Gallagher had said, on Sunday the seventh and again on Monday the eighth, that he thought he was going to die and that his mother should not be told. But on Thursday, at some time in the morning of that day, after expressing the belief that he could not get well, he said what we admitted as his dying declaration, or rather as the testimony of the witness Thomas Macaffrey to his dying declaration in answer to the question, how did it

happen, or how was this: 'I went out with Silcox, and Silcox went in, and Silcox put some meat on the stove to fry, and the cats started to run round, and I said I would either feed those cats or shoot them, and he says: " Gallagher, you insult me and I will shoot you;" and I got up and went to the door to get my coat, and put it on and turned to get my hat, and Silcox came downstairs and let fly.'] [5]    Whether he got his hat or not does not appear, as we recollect the evidence.

"It is for the court to decide upon the admissibility of alleged dying declarations.    Such declarations must relate directly to the material facts and circumstances of the alleged murder, or of the injury from which death ensues, and they must be made under the fixed belief and moral conviction that death is impending and is certain to follow almost immediately, without opportunity for repentance, and when every hope in this world is gone, when he has despaired of life and looks to death as inevitable and at hand.    When a person apprehends that he is thus at the point of death, when every motive to falsehood is silenced and the mind is induced by the most powerful considerations to speak the truth, the law in its wisdom considers such situations as creating an obligation equal to that imposed by a positive oath administered in a court of justice.

"The court determines as to the admissibility of dying declarations; but their weight, as tending to prove or disprove, is to be considered by you, as is that of the other evidence in the case.    It is your duty to carefully scrutinize and dispassionately weigh the evidence of all the witnesses in the case, and to give proper credit to each and all, if it is possible to reconcile all the evidence with the presumption that each witness has intended to speak the truth.    But if on comparison of all the evidence, having regard to the ability or inability of the witness to know the truth, to his manner and appearance on the witness-stand, to his disposition (if any be shown) to baffle inquiry or to suppress or to avoid telling the truth as to the occurrence or to give color to the same in favor of the one side or of the other, you cannot reconcile the testimony of the different witnesses; then you must give credit where you think credit is due, and the degree of credit to be given to each and to all of the witnesses is a question for you alone.

"One witness at least for the commonwealth testifies—

Thomas Macaffrey—that, as he ran to the rescue of his cousin
Gallagher, passing Silcox, he heard him (Silcox) make the re-
mark: 'You son of a bitch, I told you I would shoot you and
I did.' Other witnesses, some we think on the part of the
Commonwealth, testify that Gallagher at various times between
the shooting and his death said that the shooting was an acci-
dent, that the wound did not amount to much or that the affair
was of no consequence, the occurrence accidental and that they,
the boys, meaning probably all within hearing of his voice,
should keep quiet about it. Van Gilder testifies that he talked
with the wounded man, and that he said that he and Silcox
were drinking together and Silcox had a gun in his hand and
it went off 'with an accident,' that is, accidentally—that Silcox
had a gun in his hand and that the shooting was an accident.
[He does not remember handing his policeman's club to Gal-
lagher nor that Gallagher took the club and therewith illus-
trated how the gun was held by Silcox; though Mary Ellen
Gallagher, sister of Frank, says that this was done and that
Van Gilder thereupon remarked: 'Yes, that must have been
the way of it because he got it on the side of the leg.' She
also relates what she remembers of her brother's declaration
as to turning for his hat and then receiving the charge of shot
in his leg; and at the close of her testimony says: 'Then I heard
him also say, I told you that I would shoot you and I did.'
Perhaps referring to her brother's repetition of something said
by Silcox; but the jury must determine the meaning of the
witness, if they can, from the language she used. On the other
hand, Henry Magill, a witness for the defence, says that after
Silcox was arrested the deceased said: 'That is all the good
it will do you; I will never appear against him.' ]" [7]

Defendant's points were as follows:

"1. That if the jury believes the testimony of Mrs. Bedow,
of Nelson Hollister, Alexander Zendall, Robert Reese, William
Shultz, Henry Magill and Lafayette Van Gilder,—that the
deceased made declarations at the time of the shooting and
subsequently thereto that the shooting was accidental, and con-
tradictory of his alleged dying declarations; such declarations
are to be taken into consideration by the jury, and if true
there should be an acquittal. *Answer:* We have carefully
instructed you as to that, and we affirm the point so far,—

their testimony to such declarations should be carefully considered. But the further part of the point, proceeding thus: ' And if true there should be an acquittal,' we cannot affirm; it may be true that such declarations were made; and yet there may be in the case sufficient evidence above and beyond that to satisfy your minds beyond a reasonable doubt, so that you might convict of one or of the other of the crimes laid in this indictment. Suppose it true that the deceased said that the arrest would do no good, that he would never appear against the defendant and that he said the wound was slight and did not amount to much and that it was accidental—all that he may have said, and all that these witnesses testify to he may have said; and yet there may be sufficient evidence on the part of the commonwealth (from the physicians and others) of facts and circumstances surrounding the case, to convince your minds beyond a reasonable doubt that the defendant may be guilty of one or of the other of the two crimes included in the charge laid in this indictment. That the person who is injured does not wish to prosecute does not prevent a prosecution. It is the peace and the dignity of the commonwealth, as well as the rights of the individual, that are infringed; and any good citizen would be privileged to prosecute, whether the person particularly injured did so or not." [8]

" 2. That if the jury believe that the alleged dying declaration, as testified to by Thomas Macaffrey, is doubtful—that is, first as to whether it was ever made, and, second, as to whether it was made under the influence of delusion, then there should be an acquittal." Refused. [9]

" 3. That if the jury have doubts that such alleged dying declaration was ever made, then there should be an acquittal." Refused. [10]

" 5. That if the jury disbelieve the testimony of Thomas Macaffrey as delivered from the stand, then there should be an acquittal." Refused. [11]

The following certificate, signed by the president and associate judges, was printed in appellee's paper-book: " We the undersigned judges comprising the aforesaid court do hereby certify and declare that, at the beginning of the trial of the above mentioned case, the president judge directed the clerk to enter upon the records the fact that the defendant was pres-

ent in court at every stage and step in the trial and hearing of the case, and further knowing that the prisoner William Silcox, was so present, we hereby direct and order the prothonotary and clerk of said court, E. G. Hoffman, Esq., to correct and amend the said record of the trial and proceedings relating thereto, so that it will appear that the said defendant Silcox was present in court at every stage of the case."

The official stenographer also certified "that the president judge at the beginning of the trial of said case directed the clerk, E. G. Hoffman, Esq., to note upon his record or minutes of the said trial, that the defendant was at every stage of the case present in court, and, depending upon said clerk to have it appear upon his records, I did not note the fact of his presence in court on my notes."

*Errors assigned* were: (1) The record does not show the presence of the defendant at the trial, or at the several adjournments thereof from day to day, nor that he was asked at bar why judgment should not be pronounced against him, nor that he was present when sentence was pronounced against him by the court, and contains nothing to sustain a conviction and sentence; (2–11) instructions; (12) ruling; quoting instructions, bill of exceptions and evidence.

*James Scarlet, W. J. Baldy* with him, for appellant, cited, on 1st assignment: 4 Bl. Com. 342; Prine v. Com., 18 Pa. 103; Dougherty v. Com., 69 Pa. 286; on 3d and 4th assignments: Stouffer v. Latshaw, 2 Watts, 165; Meyers v. Com., 83 Pa. 131; Rudy v. Com., 128 Pa. 500; Fawcett v. Fawcett, 95 Pa. 376; on 5th assignment: Goersen v. Com., 99 Pa. 388; on 6th assignment: Fawcett v. Fawcett, 95 Pa. 376; Linn v. Com., 96 Pa. 285; on 7th assignment: Stokes v. Miller, 10 W. N. 241; Egbert v. Payne, 99 Pa. 239; on 8th assignment: Tenbrooke v. Jahke, 77 Pa. 393; on 9th assignment: Whart. Hom. § 742; on 10th and 11th assignments: Whart. Hom. §§ 643, 694; Com. v. McKie, 1 Gray, 61; on 12th assignment: Whart. Cr. Ev. §§ 290, 295, 298, 371; Whart. Hom. § 248; State v. Elliott, 4 Cent. L. J. 464; McGinnis v. Com., 102 Pa. 66.

*William Kase West,* district attorney, for appellee, cited:

Tiffany v. Com., 121 Pa. 165; Com. v. Murray, 2 Ash. 41; Small v. Com., 91 Pa. 304; Kilpatrick v. Com., 31 Pa. 198; Railing v. Com., 110 Pa. 100 ; Com. v. Straesser, 153 Pa. 451; Com v. Drum, 58 Pa. 9.

OPINION BY MR. JUSTICE McCOLLUM, May 14, 1894:

We have carefully read and considered the evidence in the case, the instructions to the jury, the several specifications of error, the argument of the learned counsel for the appellant and the reply of the learned district attorney. All the specifications except the first and twelfth allege error in the instructions. The first specification complains that the record prior to the amendment of February 17, 1894, did not show the presence of the defendant at every stage of the proceedings which resulted in his conviction. That he was present during the trial and when the sentence was pronounced, and that full opportunity for the exercise of all his rights in relation to both was accorded to him, is not denied. The specification therefore rests on the common law doctrine that in capital cases the record must show affirmatively that the prisoner was present at every stage of the proceedings against him. The contention of the defendant based thereon is that although he was actually present he is entitled to a new trial because the clerk neglected to note his presence on the record. In the light of the undisputed facts there is no real merit in this contention ; it is purely technical and it ought not to prevail unless the amendment which made the record conform to the fact was unauthorized. We think the amendment was clearly within and a proper exercise of the power of the court. It simply supplied a clerical omission and placed the record in this particular in harmony with the fact. It excluded the possibility of an inference from the record opposed to the truth of the case, but it did not deprive the defendant of any substantial right. What right had he to require that a defect in the record arising from an oversight of the clerk in keeping it and which left room for an inference hostile to the undisputed facts, should be perpetuated for his benefit? He neither lost nor acquired anything by the defect which prevented the correction of it in accordance with these facts. There was nothing in the nature or character of the defect or in the circumstances of the case which placed

it beyond the power of amendment. This power was not taken away or impaired by the appeal to this court. Dougherty v. Commonwealth, 69 Pa. 286 ; Brown v. Commonwealth, 78 Pa. 122.

The twelfth specification alleges error in the admission of the dying declarations of the deceased. These declarations were objected to on the ground that the commonwealth had not laid sufficient ground for introducing them. It appeared to the court from the testimony of the witness to whom they were made that the deceased " was in his right mind," and conscious that his death was imminent at the time he made them. It would have been more satisfactory perhaps if stronger and clearer evidence of the mental capacity of the deceased had preceded their admission. But no suggestion came from the defendant's counsel that the deceased was not " in his right mind " when the declarations were made, and as there was a prima facie showing that they were competent, we cannot convict the learned court of error in admitting them.

The eighth specification is founded upon the refusal of the court to affirm without qualification the defendant's first point, which was as follows : " If the jury believe the testimony of Mrs. Bedow, of Nelson Hollister, Alexander Zendall, Robert Reese, William Shultze, Henry Magill and Lafayette Van Gilder, that the deceased made declarations, at the time of the shooting and subsequently thereto, that the shooting was accidental, and contradictory of his dying declarations, such declarations are to be taken into consideration by the jury, and if true then there should be an acquittal." In answer to this point the learned judge said : " We affirm the point so far— their testimony, to such declarations should be carefully considered. But the further part of the point proceeding thus, ' and if true there should be an acquittal,' we cannot affirm." He then proceeded to explain to the jury why it could not be affirmed, and from his explanation it is obvious that he misapprehended the point. The declarations referred to were that the shooting was accidental, and he was asked to say that if they were true then there should be an acquittal. If the declarations were true the shooting was accidental, and if it was, we cannot conceive upon what theory of or evidence in the case there could be a conviction of murder or voluntary man-

slaughter. The answer to the point in question amounted to an instruction that, although the jury were satisfied from the evidence in the case that the shooting was accidental, they might convict the defendant of the crime charged in the indictment. We are clearly satisfied that the instruction complained of in the eighth specification was erroneous and prejudicial to the defendant.

The second, third, fourth, ninth, tenth and eleventh specifications need not be separately considered or discussed in this opinion. We discover nothing in them which calls for a reversal of the judgment. In some respects at least the rights of the commonwealth and the accused were mutual; they were jointly and severally entitled to have a fair trial of the issue between them, and a decision of it upon the evidence elicited on such trial. A denial of this right is a wrong done to the party deprived of it. A verdict which disregards the evidence and is founded upon the prejudices or the sympathies of the jurors is such a wrong, and we should not be astute to discover defects in an instruction obviously intended to prevent the perpetration of it.

We think the criticism of the instructions in relation to murder in the second degree and to voluntary manslaughter is unwarranted. They were fairly adapted to the evidence in the case, and they furnished no basis for the contention that they cast upon the defendant the burden of establishing his innocence.

We are not prepared to say that the defendant was entitled to an acquittal if the jury disbelieved Thomas Macaffrey's testimony. It must be conceded however that the loss of this testimony from any cause would have materially impaired the strength of the commonwealth's case. It was the only support of the alleged dying declarations of the deceased and of the claim of the commonwealth that it was shown by the defendant's own statement that he purposely fired the fatal shot. Still, the case was for the jury upon all the evidence, and we are not sure that the particular evidence referred to was indispensable to a conviction.

The fifth, sixth and seventh specifications may be considered together. They are based on that portion of the charge which was devoted to the facts of the case. In support of them it is

urged that the review of the evidence was inadequate, inaccurate and unfair. We do not discover in this review any positive misstatement of the evidence, but we do think that while the learned judge gave due prominence to the evidence on the part of the commonwealth, he inadvertently failed to bring to the attention of the jury, as he should have done, the testimony relied on by the defendant to establish his claim that the occurrence under investigation was purely accidental. It showed the existence of intimate and friendly relations between the deceased and the accused, and their declarations and conduct immediately after the shooting, which tended to negative an inference of ill will or a quarrel between them at the time of it. These were important matters which should have been clearly and distinctly presented in the charge, so that the jury in their deliberations might give to them such consideration and weight as they deserved. But they were not so presented. At no place in the charge was there anything more than a perfunctory reference to them, and then it was obscured by a prominent presentation in immediate connection therewith of some part of the commonwealth's testimony. In other words, the manner and connection in which the reference was made was quite likely to lead the jury to infer that the defendant's evidence was comparatively unimportant in the decision of the issue they were sworn to try.

In accordance with the foregoing views we sustain the fifth, sixth, seventh and eighth specifications of error and overrule the remaining specifications.

Judgment reversed and venire facias de novo awarded.