## Commonwealth *v.* Massarelli, Appellant.

336

Argued May 11, 1931. Before FRAZER, C. J., WALLING, SIMPSON, KEPHART, SCHAFFER and MAXEY, JJ.

*John E. McDonough,* with him *R. Paul Lessy, Michael S. Reps,* for appellants, cited as to the remarks of the district attorney: Com. v. Shoemaker, 240 Pa. 255; Com. v. Weber, 167 Pa. 153; Com. v. Flori, 300 Pa. 125; Com. v. Windish, 176 Pa. 167; Com. v. Green, 233 Pa. 291; Com. v. Arcuroso, 283 Pa. 84; Com. v. Ronello, 251 Pa. 329.

Cited as to self defense: Com. v. Colandro, 231 Pa. 343; Com. v. Principatti, 260 Pa. 587; Com. v. Santos, 275 Pa. 515; Com. v. Wooley, 259 Pa. 249; Com. v. Keller, 191 Pa. 122; Com. v. Curcio, 216 Pa. 380.

*Wm. B. McClenachan, Jr.,* Assistant District Attorney, with him *Clement J. McGovern,* Assistant District Attorney, and *Wm. J. MacCarter, Jr.,* District Attorney, for appellee, cited as to remarks of district attorney: Com. v. Meyers, 390 Pa. 573; Com. v. Del Vaccio, 299 Pa. 547; Com. v. Flori, 300 Pa. 125.

Opinion by Mr. Justice Walling, June 27, 1931:

On the evening of January 12, 1930, Vincent Massarelli, shot and killed Bernardino Cameransi, at Marcus Hook, Delaware County, for which he was convicted of murder of the second degree and from sentence thereon brought this appeal. The defendant and the deceased were Italians and resided in the same neighborhood. The former, a widower, had for some time paid undue attention to the latter's wife. This included frequent visits to her home in the absence of her husband and, in August, 1929, culminated in her leaving her husband and becoming a member of the defendant's household. She brought divorce proceedings against the deceased which he resisted and which were pending at the time of the homicide. There was, as might be expected, ill feeling between the men and the evidence indicated that each had made some threats against the other. On the afternoon of the homicide, being Sunday, the defendant, with others, was in a small store and after the deceased entered the former removed a revolver from his pants pocket to his coat pocket, but neither then made any demonstration against the other. Sometime after seven o'clock that evening they met again in the store, when, as shown by the Commonwealth's evidence, the defendant requested the deceased to step out of the store with him. Thereupon the defendant walked out the front door followed by the deceased. When outside they were seen holding on to each other and three shots were fired. The last shot, from the defendant's automatic revolver, killed the deceased. The other shots did not take effect. The Commonwealth's evidence indicated that the three shots were fired by the defendant; while testimony on behalf of the latter was to the effect that the deceased fired the first shot and that the other two were fired by the defendant in self defense. A twenty-two calibre revolver loaded, except one empty chamber and one empty shell, was found under the body of the deceased.

The pivotal question was, Who fired the first shot? As to this, a witness for the Commonwealth said he saw the shooting and the shots were fired in rapid succession and the flash of each went from the defendant to the deceased. While the defendant, and three witnesses who claim they were present but who did not appear at the time, said the first shot was by the deceased and that the flash from it was toward the defendant. Some circumstances seem to lend support to the contention of the Commonwealth. For instance, that the defendant asked the deceased to accompany him out of the store, that he immediately left the spot after the shooting and concealed himself for two days, and when he did surrender told the officers his mind had been a blank since the shooting, that he concealed the weapon with which the homicide was committed for some days and falsely told the officers he had thrown it away, and that as a witness in his own behalf he made a bad impression by asserting over and over again that he did not recall when cross-examined as to familiar matters about which he did not desire to remember. Moreover, the evidence is the defendant told the officers that the bullet fired by the deceased passed through his (defendant's) clothes and burned them, whereas their examination disclosed no mark of burn or bullet. That the defendant's revolver had but two empty chambers, when surrendered, proves nothing as to the number of shots he fired as he had ample opportunity to reload.

Taken as a whole, the case was one where the Commonwealth might properly ask for a conviction. To do so, however, it was necessary to challenge the evidence of the defendant and his three witnesses. There was no reconciling their testimony with that for the Commonwealth; hence, the assistant district attorney (herein called the district attorney) told the jury in his closing address that, in his belief, the defense was cooked up [in common parlance, fabricated], at least in part while the defendant was staying at the home of one of his

three witnesses immediately following the homicide. Because of this language, which was more than once repeated, the defense asked for the withdrawal of a juror and continuance of the case. This the trial judge refused but said to the jury to leave out the belief of the district attorney.

No error was thereby committed. While a district attorney should avoid stating his personal belief he may properly express his opinion on the evidence narrated in the case: Com. v. Meyers, 290 Pa. 573, 581; 16 C. J. 908. Here, he was discussing the testimony for the defense and he must either treat it as false or abandon the case. Surely a district attorney need not surrender the Commonwealth's case because testimony for the defense is inconsistent with guilt.

Furthermore, the question of the withdrawal of a juror is one largely in the discretion of the trial judge and an appellate court will only interfere to correct a plain abuse thereof. Nothing here occurred to suggest the propriety of so doing. This question needs no further comment as we have fully considered it in recent cases. See Com. v. Del Giorno, 303 Pa. 509, and cases there cited. While an appellate court will not reverse in such case unless the logical effect of the ill-advised remarks of counsel was to create an improper prejudice in the minds of the jurors and thus tend to prevent a fair trial (see Com. v. Davison, 99 Pa. Superior Ct. 412), yet it is well to keep in mind that the appellate courts can and will if necessary grant relief to a defendant whose rights have been disregarded by a district attorney. See Com. v. Ronello, 251 Pa. 329; Com. v. Shoemaker, 240 Pa. 255.

The defendant's twelfth request could not be affirmed because it assumes that the deceased was undertaking to shoot the defendant at the time of the homicide; while under the evidence that was a seriously disputed question. The trial judge explained this matter to the jury in refusing the request. A request can never be affirmed

which assumes the truth of a disputed question of fact: Wust v. Erie City Iron Works, 149 Pa. 263; Jackson v. P. R. R. Co., 228 Pa. 566; and see Laginsky v. McCollough, 280 Pa. 286; Dodson Coal Co. v. New Boston Land Co., 276 Pa. 452.

We have referred to the only questions discussed at the argument or suggested by the statement of the questions involved and find no error.

The judgment is affirmed and the record is remitted that the sentence may be carried out.

DISSENTING OPINION BY MR. JUSTICE MAXEY:

I am of the opinion that the remarks made by the district attorney in his closing argument were improper and highly prejudicial to the defendant and that a mistrial should have been declared and a new trial ordered.

The defense in this case was self defense. There was evidence that the deceased, and not the defendant, was the aggressor in the fatal encounter. It was he who had the motive for aggression. The deceased's wife had left him and her suit against him for divorce on the grounds of cruel and barbarous treatment was pending in the courts of Delaware County at the time of the homicide. She was then employed by the defendant as a housekeeper. On the afternoon of the homicide the deceased and defendant were in Cestili's store. They then said nothing to each other. The deceased went out, and he and Cestili, the storekeeper, talked to each other outside and a witness heard the deceased say to Cestili: "You needn't be afraid. I am not going to start any trouble in there, but I am going to call him out." The deceased then departed and the defendant later came out. The witness who had heard the deceased's remarks walked home with the defendant and told him what the deceased had said. This was 3:45 p. m. At 7 p. m. the defendant while at his home was informed—so he testified—that he was wanted at the store. He testified that he went to the store and asked, "Who wants to see me?"

The deceased answered, "Me." Both of them walked outside. The storekeeper and two others said the defendant asked the deceased to go outside, that he wanted to tell him something. Both went outside and after two minutes, according to Cestili, three shots were fired. One witness testified that when the two men got outside the defendant said to the deceased, "I want to talk to you," and the deceased replied, "Not talk to me," and he pulled his hand away and the deceased then fired a shot and the defendant answered with two shots. The deceased "went down," and the pistol fell out of his hand. Two other witnesses also testified that the deceased shot first. A Commonwealth's witness who was one hundred feet away from this shooting, done on a foggy night, testified he saw the flash of three shots going in the direction of Cameransi, the deceased. The defendant testified that Cameransi when he got outside pulled out his gun and the defendant got hold of his wrist and they struggled and Cameransi got loose, and the defendant said he, the defendant, jumped back and "holloed to him not to shoot." He used the Italian word "nonsparate," and then Cameransi shot. The defendant said: "I saw my life in danger. I figured up if I was to run he would shoot me in the back, if I was running he would shoot me in the back; and I pulled my gun and shot him." Defendant said he pulled the trigger twice. Cameransi fell on the second shot. A policeman who arrived at the scene of the shooting between 7:30 and 8 p.m. found a revolver at the scene with six apparently undischarged cartridges and one discharged cartridge. Another Commonwealth witness testified that the police officer found this pistol under the back of Cameransi.

This synopsis of the testimony is sufficient to indicate that there was evidence in the case from which the jury might infer that the shooting of the deceased by the defendant was justifiable homicide in self defense. Therefore, it became important that in this case, as in all cases, the jury's minds in considering this evidence

should be open and unprejudiced. The district attorney in his closing argument to the jury made certain remarks which constitute the subjects of the sixth, seventh and eighth assignments of error. In referring to the testimony of the eyewitness Pastore, the district attorney said: "Pastore was the man at whose house this defendant stayed when he hid himself. Pastore was the man at whose house this defendant's—one of the attorneys here—went to see him, interviewed him. I say at that interview and at subsequent interviews this defense was cooked up. They are the eyewitnesses or supposed eyewitnesses called by the defense." A little later he said in his argument: "I am no longer the individual. I am your representative here." Then after sixty words he said: "I reiterate it is my belief from all the evidence produced here that the major portion of the defense in this case was cooked up; and I think we all know the meaning of that expression." A little later he said: "But I yet contend the major portion of the defense, particularly of this defendant, was cooked up at the time I have before mentioned." Apparently "the time before mentioned" was when defendant's counsel was interviewing him. Again in his argument with reference to the testimony of the Commonwealth's witnesses that the pistol was found under Cameransi's body, the district attorney said: "Well, of course, with that pistol in his hand, it might have fallen under his body, and it might have been planted by defendant, Massarelli, because, ladies and gentlemen, I say I feel from the evidence that there has been much cooking and planting on the side of the defense." These remarks of the district attorney, which were taken down stenographically, were properly objected to by the defendant's counsel, who promptly asked for the withdrawal of a juror. The motion was refused by the court in each instance. Counsel also asked the court to instruct the jury to disregard the statements on the part of the district attorney about the "cooked up" defense. The court replied: "I will not do

that." If the defense was "cooked up," i. e., if perjury had been suborned, that was a material fact in the case, but such a fact cannot be proved by statements of advocates. If the district attorney was in possession of facts showing that the defense was "cooked up," it was his duty to offer these facts to the jury by witnesses under oath, with the opportunity to the defense to cross-examine these witnesses. Jurors are not trained to discriminate between facts legally proved and alleged facts lodged in their minds by reckless and unsworn statements. Counsel have a right to illuminate their argument by illustrations from history or literature or from well-known current events. For example, it is entirely proper for a district attorney, when a defendant on trial calls character witnesses to prove his good repute, to refer to the fact that many well-known men have been convicted of crime in spite of the fact of their good reputations. That would be a legitimate argument. But if the district attorney, having offered in evidence nothing to refute the evidence of the defendant's good repute, should declare in his closing argument that the defendant had previously been convicted of a crime or possessed an evil reputation, this would be unsworn testimony on a material issue, and the duty of the court to withdraw a juror and continue the case would be undoubted. In the case before us the defendant was even more seriously prejudiced. His defense of self defense (which apparently had much merit in it) had been stigmatized by opposing counsel as a "cooked up" or fabricated defense, with his own counsel a party to the fabrication. The man who made that charge was representing the Commonwealth as a quasi-judicial officer, as this court, in Com. v. Nicely, 130 Pa. 261, declared the district attorney to be. In fact, in the case before us the district attorney just before making this grave charge called the jury's attention to the fact that he was speaking in an official capacity when he said: "I am no longer an individual. I am your representative." This officer's

status, therefore, gave great weight to his statement, and when the trial judge upon being requested "to instruct the jury to disregard that statement on the part of the district attorney in its entirety," replied, "I will not do that," the statement of the district attorney apparently received judicial sanction. To argue from the evidence the improbability of any witness's story is one thing; to stigmatize the whole or a vital part of the defense as a fabrication and to charge opposing counsel as being the fabricator is quite another thing. Nothing can be more harmful to a defendant on trial than to have his counsel's character discredited before the jury by the district attorney, with the apparent approval of the trial judge. There was no evidence in the record either to support the charge made or fairly to give rise to a suspicion of the defense being "cooked up."

As to the charge that the defendant planted the revolver under the deceased, there was not a scintilla of evidence to support it. Manerchia, the same Commonwealth witness who testified about the flashes from the defendant's revolver, also testified that after the shooting the defendant "walked away fast." If the defendant had stopped to plant a revolver, this witness ought to have seen it as he saw the other things to which he testified. Furthermore, it is highly improbable that the defendant in the excitement of the moment would stop to plant under the deceased a gun with one cartridge exploded. There is not a particle of evidence that he did, and the district attorney who described himself as the jury's "representative" ought not to have been permitted to lodge that suspicion or insinuation in the minds of the jury. One of the essentials of a fair and impartial trial and the chief function of the rules that exclude hearsay and other incompetent testimony is to keep from the minds of the jury mere suspicions or insinuations so that the verdict may be based upon the sworn testimony and on nothing else. In criminal trials great care is usually taken to keep from the jurors prejudicial news-

paper articles so that the jurors' minds may remain open to the impartial consideration of the sworn testimony. How much more important is it that a district attorney should not make unwarranted remarks which cannot fail to affect the openmindedness of jurors trying persons accused of serious crime! This court has on other occasions set aside convictions on account of district attorneys' remarks which were far less prejudicial than those now being reviewed.

In Com. v. Shoemaker, 240 Pa. 255, a conviction of voluntary manslaughter was set aside on account of remarks made by the district attorney which were somewhat equivocal and were much less prejudicial to the defendant than the remarks made in the case before us. In that case this court, speaking through Mr. Justice MOSCHZISKER, said: "No matter what version we may accept, the remarks of the district attorney were highly objectionable and likely to prove prejudicial to the defendant. 'It is error for counsel......to state ......his own knowledge of facts unless he has testified thereto as a witness......or to insinuate that he has knowledge of facts which are calculated to prejudice the opposite party': 38 Cyc. 1496."

In Com. v. Bubnis, 197 Pa. 542, 550, this court said: "In his official capacity, clothed with the gravest responsibilities, and exercising functions in a measure judicial, the district attorney should ever be cautious in expressing to a jury his belief in the guilt of the accused. If convinced of it, his duty is to lead them to his own judgment by pointing out to them, intelligently and impartially, the evidence which cannot fairly justify any other conclusion."

In the case before us the district attorney openly expressed his belief that the defense was a fabrication. This was equivalent to expressing his belief in the guilt of the accused. In Commonwealth v. Green, 233 Pa. 291, a conviction of murder was set aside because the district attorney in his closing argument said: "There

is no one on earth who can tell how these things came into the possession of the prisoner, but the prisoner." This court said this remark "was in the nature of an adverse reference to the neglect of the defendant to offer himself as a witness, which the jury might well have regarded as creating a presumption against the accused. The effect of the remark should have been corrected by setting aside the verdict and granting a new trial."

In Commonwealth v. Swartz, 37 Pa. Superior Ct. 507, the Superior Court held that where a district attorney in cross-examining a witness, after the witness had answered a question, said, "That is a lie," and opposing counsel made objection, the court should have granted the request that a juror be withdrawn and the case continued.

In Commonwealth v. Ronello, 251 Pa. 329, 338, this court reversed the court below because the trial judge proceeded with a trial after the district attorney in his closing argument asserted his personal belief that the defendant was guilty of murder. The trial judge cautioned the jury not to be influenced by the objectionable remarks; nevertheless this court, in an opinion by Justice STEWART, declared the cautioning to be "wholly inadequate to the protection of the defendant's rights." Justice STEWART characterized the district attorney's remarks as "wholly inexcusable and as violative of the prisoner's right to a fair trial on the evidence submitted and that alone, that a mere caution to disregard could give no assurance that the prejudice otherwise certain to result to the defendant had been averted."

I think the remarks of the district attorney in the case before us exceeded in inexcusableness and in violence to defendant's rights the remarks that called forth Justice STEWART'S condign condemnation in the case cited. There the district attorney was merely declaring what his honest convictions were, and the court cautioned the jury to disregard his remarks. Here the district attorney did not talk about his convictions, he talked as

though he knew the defense had been "cooked up," and the trial judge refused to caution the jury to disregard his remarks. The jury would naturally infer from the district attorney's remarks, particularly when they seemed to receive judicial sanction, that the district attorney was in possession of sources of information not available to them as to the defense's spurious and untrustworthy character. If remarks such as those excepted to in this case are to receive judicial sanction, it will be difficult to set any logical barrier to what a district attorney may say to a jury, and the prisoner's right to a fair and impartial trial will become more formal than substantial. What Blackstone said about trial by jury and the new and arbitrary methods of trial which would sap and undermine the institution of trial by jury may be pertinently quoted here, as follows: "However convenient these may appear at first, (as doubtless all arbitrary powers, well executed, are the most convenient) yet let it be again remembered that delays and little inconveniences in the forms of justice are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon this sacred bulwark of the nation are fundamentally opposite to the spirit of our Constitution, and that, though begun in trifles, the precedent may gradually increase and spread to the utter disuse of juries in questions of the most momentous concern": 4 Blackstone's Commentaries, 350.

A former Chief Justice of this court, JEREMIAH S. BLACK, in his argument before the Supreme Court of the United States in the defense of the right to trial by jury in the case of Ex parte Milligan, 4 Wall. 2, well said: "In peaceable and quiet times, our legal rights are in little danger of being overborne; but when the wave of arbitrary power lashes itself into violence and rage, and goes surging up against the barriers which were made to confine it, then we need the whole strength of an unbroken Constitution to save us from destruction."

In Cooley's Constitutional Limitations, vol. 1, p. 87, conditions that impair the value and usefulness of trials by jury receive that jurist's condemnation.

A conviction after a trial before an unsworn jury or before a jury of less than twelve persons would, if excepted to, be promptly set aside, yet these deficiencies cannot compare in injurious consequences to the defendant to the trial before a jury whose minds have been prejudiced against him and his counsel by remarks such as were made by the district attorney in this case. A defendant's right to a fair and impartial trial is not maintained inviolate in a trial which though correct in form has injected into it a spirit of unfairness by an official whose sworn duty it is to help secure even-handed justice.

In the annual address before the American Bar Association, delivered by Joseph H. Choate in 1898, that great lawyer said, in referring to the then recent trial of Zola in France: "The government took up the challenge [i. e., of Zola to the government for its unfairness in the Dreyfus case] and there followed a trial which for reckless and cruel disregard for every principle of right and justice known to us, is surely without a precedent in modern history, yet it purported to be a jury trial."

No matter how loud may be the clamor for convictions in criminal cases, it is well for district attorneys at all times to keep in mind what was so well said by Chief Justice PAXSON in Commonwealth v. Nicely, supra, p. 270: "We have no difficulty, however, in measuring the extent of zeal which counsel for the Commonwealth may properly display. The district attorney is a quasi judicial officer. He represents the Commonwealth, and the Commonwealth demands no victims. It seeks justice only, equal and impartial justice, and it is as much the duty of the district attorney to see that no innocent man suffers, as it is to see that no guilty man escapes." This court has often quoted this statement of Justice PAXSON and applied it in many cases under judicial

review. In my opinion, there has never been before this court a case more appropriate for the application of the letter and spirit of Judge PAXON'S statement than the case now before us.

I would give the defendant a new trial.