Commonwealth *v.* Cisneros, Appellant.

Argued March 21, 1955. Before Stern, C. J., Stearne, Jones, Bell, Chidsey, Musmanno and Arnold, JJ.

*Michael von Moschzisker,* with him *John Rogers Carroll* and *Thomas D. McBride,* for appellant.

*Samuel Dash,* Acting District Attorney, with him *William. T. Gennetti,* Assistant District Attorney, *Victor Wright,* Assistant District Attorney, and *Richardson Dilworth,* District Attorney, for appellee.

OPINION BY MR. JUSTICE ARNOLD, April 18, 1955:

The defendant was indicted, tried before a jury, and found guilty of murder in the first degree, the penalty being fixed at life imprisonment. At trial he was represented by able counsel who had wide experience in homicide cases, but who did not argue this appeal.

Defendant had gone to his wife's home, some distance from his own residence, and when she called her mother on the telephone, he called into the telephone that by the time the mother got there the daughter would be dead,—which statement he made come true. He quite clearly shot his wife, Dorothy, with a 22 calibre target pistol, causing wounds from which she died. He then turned the same weapon upon himself, inflicting a wound from which he fully recovered. At the hospital to which he was taken he admitted the shooting of his wife.

The pistol was obtained by the defendant two days before the shooting, although he testified he had obtained it on the same day. He wrote two notes to his father and mother, stating he was going to commit suicide because of the unrequited love he had for his wife. He did not testify that he did not shoot her, but testified that he did not intend to kill her or to do

anything more than scare her. This the jury did not believe.

The defendant testified that he was drunk, and that his wife had said he was half Mexican and half Puerto Rican and refused to have children by him out of fear that they would be black. The jury obviously rejected the contentions of the defendant, who brings this appeal.

We have here the acquiring of the murder weapon two days before the homicide, thus evidencing premeditation; and the statement to the mother of the deceased that the wife would be dead before the mother reached her. The fact that the defendant twice shot his wife is evidence of malice: *Commonwealth v. Drum*, 58 Pa. 9, 17; *Commonwealth v. Chapman*, 359 Pa. 164, 167, 168, 58 A. 2d 433.

The appellant further contends that the assistant erred in its comment on the guilt of the defendant. The court had a right to so comment so long as the jury was told that the court's opinion was not binding upon it, and the court left that determination to the jury. This the court did. See *Commonwealth v. Bibalo*, 375 Pa. 257, 100 A. 2d 45; *Commonwealth v. Lance*, 381 Pa. 293, 113 A. 2d 290.

The appellant's first contention is that the court district attorney in his closing address to the jury said: "He [the defendant] lied about where he got the gun," and contends that the trial court erred in overruling his motion for the withdrawal of a juror. The defendant's objection was not timely as it was made at the conclusion of the assistant district attorney's address; but even if it was timely the action of the trial judge was the subject of his sound discretion. See *Commonwealth v. Wilcox*, 112 Pa. Superior Ct. 240, 316 Pa. 129, 173 A. 653, and *Commonwealth v. Kerr*, 171 Pa. Supe-

rior Ct. 131, 89 A. 2d 889. In *Commonwealth v. Meyers,* 290 Pa. 573, 581, 139 A. 374, this Court stated: "Where, under all the circumstances of the case, the verdict rendered is a just one, the language of the prosecuting officer which will justify a reversal must be such that its unavoidable effect would be to prejudice the jury . . ." In the following cases the district attorney used such phrases as "a typical gunman's defense": *Commonwealth v. DelVaccio,* 299 Pa. 547, 554, 149 A. 696; "defense was cooked up": *Commonwealth v. Massarelli,* 304 Pa. 335, 338, 156 A. 101; "the prisoner didn't have the heart of a man or the soul of a man": *Commonwealth v. Smith,* 270 Pa. 583, 588, 113 A. 844; "I will ask you to say that they [the eyewitnesses who had fled the jurisdiction] are staying away from this jurisdiction for the purpose of helping this criminal": *Commonwealth v. Touri,* 295 Pa. 50, 57, 144 A. 761; "the defendant might be called a skunk": *Commonwealth v. Davison,* 99 Pa. Superior Ct. 412, 414. None of these was held to be prejudicial error. We find no merit in this contention.

The next contention is that the court took away from the jury the right to render a verdict of voluntary manslaughter. Since there was no evidence to reduce the crime to voluntary manslaughter, that point is settled by *Commonwealth v. Yeager,* 329 Pa. 81, 85, 196 A. 827; *Commonwealth v. LaRue,* 381 Pa. 113, 112 A. 2d 362. The evidence of the defendant was that his wife made remarks about him that enflamed him, and had emphasized them by sticking her finger at his shoulder. The law of Pennsylvania is clear that no words of provocation, reproach, abuse or *slight assault* are sufficient to free the party from guilt of murder. The legal "battery" committed in this case was of a most trivial nature which, combined with the words used, is of no moment in reducing the crime to man-

slaughter: *Commonwealth v. Newson,* 277 Pa. 48, 120 A. 707.

The charge by the court on reasonable doubt was unimpeachable in the light of the fact that no further elaboration of instructions was asked for by the trial counsel. While the court did not specifically charge that character evidence alone might work an acquittal of the defendant, no exception was taken to this charge nor was the matter raised in a motion for new trial. However, in the absence of a request for such instruction, it was not error to fail to charge it. This Court said in *Commonwealth v. Barnak,* 357 Pa. 391, 419, 54 A. 2d 865: "Taking an appeal in criminal cases is not a game in which the appellant wins if he can show that the trial judge fell a few degrees short of perfection in the conduct of his trial. This court has consistently refused to reverse convictions of murder in the first degree, even with the death penalty imposed, for errors in the conduct of the trial or in the admission of evidence or in the judge's charge, when these errors did not deprive the defendant of the fundamentals of a fair trial." In *Kotteakos v. United States,* 328 U. S. 750, 764, the United States Supreme Court said: "If, when all is said and done, the *conviction* is sure that the error did not influence the jury, *or had but very slight effect,* the verdict and the judgment should stand . . ." (Italics supplied). The court charged practically that character evidence alone would justify an acquittal. We are not impressed by the fact that the court stated that it was its "conviction" that "under the evidence . . . a verdict of not guilty would be a miscarriage of justice. However, my opinion is not binding upon you." This was not harmful to the defendant and the jury could not have drawn the distinction between the use of the word "conviction" and the use of the word "opinion" which the appellant claims. It

would be unwarrantable to hold that the jurors in this case, who were undoubtedly laymen,—not philologists or lexicographers,—would understand the word "conviction" to be something different than "opinion."[1] The court is not obliged to use any particular phrase in the absence of request for such charge: *Commonwealth v. Beingo,* 217 Pa. 60, 62, 66 A. 153.

The appellant asks that the conviction be reversed because the court did not charge that admissions of the defendant should have been received with great caution. It was for the jury to say that the confession was voluntarily made. This the jury found and this was not denied by the defendant.

This is of the highest grade of evidence. Again this point was not raised by any exception to the charge nor on the motion for new trial.

Next the defendant challenges the court's comment on the evidence. The court had a complete right to comment thereon, providing the jury was told that the court's opinion was not binding upon it. See *Commonwealth v. Chambers,* 367 Pa. 159, 164, 79 A. 2d 201; *Commonwealth v. Bibalo,* 375 Pa. 257, 100 A. 2d 45.

The court charged that the jurors must not be guided by any prejudice against the defendant nor, on the other hand, be swayed by any sympathy toward him, and again charged: "You . . . must discharge . . . [your] duty . . . without sympathy for the defendant or prejudice against him." This was a correct statement. See *Commonwealth v. Silcox,* 161 Pa. 484, 29 A. 105.

We are requested to alter the rule in *Commonwealth v. Drum,* 58 Pa. 9, which we are unwilling to do.

We have reviewed the law and the evidence under the Act of 1870, P. L. 15, 19 PS §1187, and find that

---

[1] Cf. *Territory v. Buick,* 27 Haw. 28, 37.

the verdict of the jury is amply supported by the evidence. The defendant was fortunate that he did not receive a recommendation of the death penalty at the hands of the jury.

The judgment of sentence is affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Alfred Cisneros, born in America of Mexican and Puerto Rican parents, was tried for felonious homicide in Philadelphia and convicted of murder in the first degree. A study of the record demonstrates quite palpably that he did not receive the fair and impartial trial which the Constitution of the United States and the Constitution of Pennsylvania, both formulated in the city of his trial, guarantee to him as a citizen of this American Republic. Although the jury chosen to render him justice listened for three days to evidence, it was stripped of all powers of decision by the Trial Judge who effectually dictated the verdict by telling the jury that "a verdict of not guilty would be a miscarriage of justice." This kind of language placed before the jury a dead end in their path of deliberation, it erected a barrier with which conscience, logic and intelligence could not cope. This language almost suggested to the jury that they themselves might have to answer for some species of misconduct if they acquitted the defendant. Nor was the dogmatic direction of the Judge in any way mitigated by the fact that he added that his opinion was not binding on the jury. What is meant by "not binding?"

That the Judge did not intend to modify his "convicting" words is demonstrated by the fact that he immediately went on to crescendo the degree of fate which the jury could impose on the defendant. He instructed them that they could find him guilty of sec-

ond degree murder, they could render a verdict of first degree murder with life imprisonment, or they could return a verdict of murder in the first degree and affix the penalty at death.

The Judge's statement above quoted appears at the very end of the charge. The full wording is as follows: "Therefore, members of the jury, depending upon the manner in which you resolve the issue of fact in this case, and apply the law, as I have previously defined it to you, to those facts, you can return one of four possible verdicts, first, a verdict of not guilty, although I previously indicated to you that it is my conviction that under the evidence in this case a verdict of not guilty would be a miscarriage of justice. However, my opinion is not binding upon you."

The Trial Judge here says that it is his *conviction* that an acquittal would amount to a miscarriage of justice, but that his opinion is not binding on the jury. Of course, it is obvious that the word *conviction* rises to a higher degree of certainty than opinion. Webster's International Dictionary defines conviction as: "State of being convinced." "A strong persuasion or belief; as, to live up to one's *convictions;* an intensity of thorough *conviction.*"

The Majority disposes of the Trial Judge's invasion of the jury box by saying that the Judge's language "was not harmful to the defendant" because "the jury could not have drawn the distinction between the use of the word 'conviction' and the use of the word 'opinion' which the appellant claims. It would be unwarrantable to hold that the jurors in this case, who were undoubtedly laymen—not philologists or lexicographers—would understand the word 'conviction' to be something different than 'opinion.'" This argument suggests either that no member of the jury was educated enough to understand the difference between

"conviction" and "opinion" or that the Trial Judge was relying upon an assumed ignorance of his audience by employing language which was to be understood as meaning something other than what it actually said. Either interpretation bestows no credit on Judge or jury.

I would grant a new trial in this case not only because of the irreparable harm done by the Judge's use of the phrase, "miscarriage of justice," but also because of the general prejudicial tone of his charge throughout. After the argumentative and partisan arguments of the district attorney and defense counsel, it is supposed that the Judge presiding over a trial will tranquilize with deliberative manner and speech the turbulent waves of thought and feeling aroused and agitated by the battling attorneys. Here, however, the Judge did not pour the oil of serenity on the billows of debate. A listening person, not noting the change in voice, or observing the identities of the speakers, might have had difficulty in determining where the district attorney ended and the Trial Judge began. At one point in his charge, after reviewing the evidence, the Judge said: "If after weighing and considering all the evidence in the case you have a reasonable doubt of the guilt of the defendant of the crime of murder for which he stands indicted, then you must return a verdict of not guilty." He then followed with: "Now, on what basis and what evidence could you return such a verdict?" In other words, on what possible basis could the jury even *think* of returning a verdict of not guilty?

He followed this cynical jibe at the defendant's case with a supposed outlining of points in the defendant's behalf: "You could acquit the defendant if under the evidence in the case you conclude either that the defendant did not shoot his wife, or if you find that he

did, that you accept and believe his testimony that he never intended to kill or harm her, that he procured the gun which he had in his possession only for the purpose of frightening her or using it upon himself, that he did not intend to fire the gun at his wife and *that in some unexplained manner several shots were discharged from the gun,* two or three of which struck the deceased and one struck the defendant, inflicting the wounds which have been described here."*

The italicized portion of the above statement is sarcasm which certainly should have no place in any charge, and especially not in one which has to do with a trial where a man's life is at stake. And then, as if this contemptuous reference to the defendant's case was not enough, the Judge proceeded to destroy every chance for a possible Not Guilty verdict by stating: "If you make such findings, you would, of course, be disregarding all the evidence in the Commonwealth's case, that evidence I have reviewed for you, consisting of both direct and circumstantial evidence *bearing on the guilt of the defendant.*"

It is no wonder that at the end of the charge, as already quoted, the Judge emphasized: *"I previously indicated to you* that it is my conviction that under the evidence in this case a verdict of not guilty would be a miscarriage of justice."

Of course, in pointing out these falls from grace on the part of the Trial Judge, it is not my purpose to suggest that he had any ulterior purpose in seeking conviction of the defendant. He undoubtedly was sincerely convinced that the defendant was guilty, but so long as we have trial by jury it is the jury which decides guilt or innocence, not the judge. If the evidence was so overwhelmingly in favor of the prosecution, as

---

\* Emphasis from here on, supplied.

the Judge assumed and believed, why was it necessary to bludgeon the jury into a verdict of guilty? Could he not assume that the jury itself would see what apparently he saw so vividly? And then with all his certitude, it was still possible the Judge could have mis-strained the evidence. In his solicitude that error should not approach the jury box he overlooked that it was within the realm of possibility that it could touch the bench. In *Commonwealth v. Karmendi,* 325 Pa. 63, 68, this Court very properly ordered a new trial when the Judge in that case shed the robe of impartiality assigned to him by law and the traditions of his centuries-old office: "Complaint is made of the temper and scope of the trial court's charge to the jury. There was elaborate comment in graphic terms on the evidence and inferences therefrom tending to indicate, on defendant's part, conduct inconsistent with innocence. The Commonwealth's closing argument was largely repeated in tenor and form appropriate only to that stage of the trial. But comment on defendant's evidence by comparison was strikingly inadequate. The charge also reveals by innuendo, if not forthright, the court's opinion that she was guilty, and was expressed in rhetoric which must have been a factor in moving the jury to the same opinion. *This is not the proper function of a charge*: Commonwealth v. Myma, 278 Pa. 505; Commonwealth v. Trunk, 311 Pa. 555; Commonwealth v. Robinson, 102 Pa. Superior Ct. 46. *Nor can such excess of statement be cured instructing by the jury that it must exercise* its own judgment."

The charge in the case at bar has other faults. It is, for one thing, confusing. And the confusion always managed to inure to the disadvantage of the defendant. The Judge charged at length on manslaughter, taking the jury on a 500-word labyrinthian tour of that complicated subject, and then he terminated the journey

with the startling declaration: "Now, members of the jury, while I have defined for you the crime of man-slaughter, both voluntary and involuntary, I instruct you that *there is no evidence here in this case that would warrant a verdict of manslaughter, either voluntary or involuntary.*" Further: "Therefore, members of the jury, get that clearly in your minds. There is no basis for your bringing in a verdict of voluntary manslaughter in this case."

As a matter of pragmatic reality, manslaughter, as I view the law, was definitely in this case. In nearly all homicide resulting from emotional disturbances and outbursts, as opposed to coldly calculated planning for material advantage, the elements of voluntary man-slaughter are invariably present for consideration. I will not burden this Dissenting Opinion with any dissertation on the law appertaining to manslaughter, but I should like to incorporate by reference my views on that topic as expressed recently in the case of *Commonwealth v. LaRue,* 381 Pa. 113.

But if manslaughter, both voluntary and involuntary, in the eyes of the Trial Judge, was out of the case, why did he charge so extensively on the theme? Considering the fact that the Judge already knew that he was ruling a manslaughter verdict out of the proceedings, his exposition on the subject was as irrelevant as a description of a trip through Egypt. However, the serious fault of the instruction on manslaughter, from the Judge's point of view, lies not in its superfluity, but in the cumulative effect of his hammering on the theme that there was no defense really left to the defendant. He forbade the jury to return a verdict of manslaughter; he instructed them not to be influenced by the district attorney's statement that the prosecution did not seek or urge a death penalty; after telling the jury that character evidence with all the

other evidence in the case could raise a reasonable doubt capable of working a conviction, if he warned: "However, as you well know, members of the jury, persons of good reputation sometimes commit crimes," and then proceeded to point out that the defendant had once committed an assault and battery; he replied to defense counsel's argument as if he were an opponent in debate; and then finally he adjured the jury that to return a verdict of not guilty would be a miscarriage of justice.

Keeping in mind the respect and even awe with which a jury looks upon the bench it would be like gathering figs from thistles to expect that the jury would defiantly oppose what the Judge so obviously desired and almost imperiously demanded. From the moment the Judge ceased speaking the defendant was doomed and the jury's deliberation could only have been an empty formality.

The consideration which Alfred Cisneros received at this trial could more easily fit into the history of the ruling caste which tyranically reigned in the land of his ancestors than accord with the chronicles of fairness always associated with Anglo-American justice.

The reasons for a new trial in this case are an open book for anyone to see, but they seem to have made no impression on the Majority which remains satisfied that no harm was done the defendant because the members of the jury, after all, were "not philologists or lexicographers" and thus could not distinguish between "conviction" and "opinion."

I dissent.