Commonwealth *v.* Heaton, Appellant.

224

Argued March 10, 1941.

Before KELLER, P. J., CUNNING-
HAM, STADTFELD, RHODES, and HIRT, JJ.

*C. William Kraft, Jr.,* for appellant.

*Louis A. Bloom,* Assistant District Attorney, with
him *Wm. B. McClenachan, Jr.,* District Attorney, for
appellee.

OPINION BY CUNNINGHAM, J., June 30, 1941:
Appellant, John J. Heaton, was found guilty by a
jury in Delaware County, under three indictments, con-

solidated for trial, charging assault with intent to ravish, indecent assault, and assault with intent to commit sodomy. A sentence of a fine of $500, and imprisonment in the county jail for not less than one nor more than five years was pronounced against him at No. 300 September Sessions, 1940, upon the verdict of guilty of assault with intent to ravish; sentence was suspended upon the other verdicts.

A reversal of the judgment and a new trial are now sought upon two general grounds: (a) The alleged insufficiency of the evidence to support the verdicts and judgment upon one of them; and (b) certain trial rulings which appellant contends were erroneous and prejudicial.

1. The indictment under which sentence was pronounced was drawn under Section 722 of the Penal Code of June 24, 1939, P. L. 872, 18 PS §4722, reading: "Whoever commits an assault and battery upon a female, with intent, forcibly and against her will, to have unlawful carnal knowledge of her, is guilty of a felony. ......"

The extent to which the proofs of the Commonwealth must go in order to sustain a conviction of this offense was thus defined in our recent case of *Com. v. Jaynes,* 137 Pa. Superior Ct. 511, 10 A. 2d 90: "The conduct [of the accused] must have been such as to justify the inference that he intended forcibly and against the will of the young woman to have unlawful carnal knowledge of her."

At the time of the occurrences relied upon by the Commonwealth, the evening and night of July 18, 1940, Rita Kelly, the prosecuting witness, was in the employ of appellant as a waitress at his taproom and restaurant, known as "Jack's Grille" and located in Stonehurst, Delaware County.

Her testimony was to the effect that while walking to work, in company with another employee, about eight o'clock that evening, an automobile occupied by appellant, Howard Livesey and Arthur Seggern, overtook

them and appellant offered to drive her to his grille. When opposite her place of employment Miss Kelly requested appellant "to let [her] get out and get to work," but "he said he was [her] boss and not to worry about it." The car turned onto Baltimore Pike and after driving about "twenty to twenty-five minutes" the party arrived at the King Kole Tavern, where the car was parked on a lot in the rear. After drinking beer until about nine-thirty they left the tavern. While going to the parking lot, Seggern and Livesey disappeared without stating they were leaving and Miss Kelly and appellant, left alone, found the car had been removed from the lot, apparently by Seggern.

In the rear of the buildings a stand had been placed for advertising and selling coca-cola. While they were near this box, the witness said appellant exposed himself, pulled up her dress and tried to have intercourse with her. The details of her testimony need not be set forth. It was to the effect that she prevented him from throwing her upon the ground by holding to the box and that her screams attracted the attention of Livesey who came back and made appellant desist; that she then ran into the tavern, told the proprietor what had happened, and made an unsuccessful effort to get a telephone message to her brother-in-law to come for her.

The testimony of Miss Kelly, if believed by the jurors, as it evidently was, despite the denials of appellant and his friends, warranted them in concluding that appellant committed an assault and battery upon her with the fully formed intent to have carnal knowledge of her forcibly and against her will and persisted in such endeavor until stopped by Livesey. The controverted issues of fact upon this branch of the case were submitted to the jury in a fair and adequate charge to which no errors are assigned.

Relative to subsequent events, Miss Kelly testified Livesey and appellant followed her into the tavern where they engaged in more drinking in which she re-

fused to join them. She further stated that upon the arrival of a taxicab, which appellant had ordered, she ran out of the hotel, got into the cab and directed the driver to take her to 46th and Walnut Street, where she lived with her sister, but that appellant followed her into the cab and told the driver to go "anywhere in Springfield."

The charges of assault with intent to commit sodomy, contained in the indictment at No. 302 September Sessions, 1940, and upon which appellant was found guilty but not sentenced, were based upon the actions of appellant in the cab as it was proceeding in the general direction of Philadelphia. In view of the present state of the record it is not necessary to describe them with any degree of particularity. Miss Kelly's testimony, in effect, was that appellant committed a brutal assault upon her and attempted to force her to submit to an act of sodomy. Her testimony, if accepted as verity, sufficiently supported the verdict of guilty rendered upon this indictment. A brief excerpt therefrom reads: "Q. What did you say or do when he endeavored to do that? A. Screamed and hollered and pleaded with the cab driver to leave me out of the cab. I said: 'Leave me out.' I started to cry, was screaming and hollering and he ignored me, and the cab driver—Q. The cab driver ignored you? A. Yes, sir. ...... Q. How many times did you scream before the cab driver finally came to a stop? A. I kept it up, screaming and crying. Q. Did you get to Philadelphia that night? A. No, sir. Q. How did you finally get out of the cab? ...... A. Heaton ordered the cab to stop and said: 'Pull over to the right and throw her out.' He said: 'Pull over to the side of the road and throw her out.' Heaton said that. Q. Did he pull over to the side of the road? A. Yes. ...... Q. Then what happened? A. As soon as he pulled over to the side of the road I quick opened the door and got up to get out—and as I did he gave me a push. Out I went and off they drove, and they

drove on. ...... Q. Where did you find yourself, in what municipality or township, if you know, when you got out finally? A. In Lansdowne."

The testimony of Miss Kelly is not without corroboration. Eli Matthew, the cab driver, whose conduct was far from commendable in that he made no effort to protect his woman passenger, testified that a door of the cab flew open several times; his description of the conduct of his passengers reads: "They were wrestling or what I don't know, because I had to watch the street too. I know they were quite well mixed up there."

Leroy Ballantine, a waiter at a restaurant located at Baltimore and Lansdowne Avenues, testified he was leaving for his home at 1:30 a. m.; that a taxi passed him in which he heard a young lady screaming and hollering, "Let me out. I don't want to go with you;" that the taxi slowed down and stopped and "the girl got out" and called, "Come here and help me. Mister, please come here and help me." Ballantine's description of her condition reads: "Her face was swollen, very red. She was crying and she was very excited." He escorted her to police headquarters in Lansdowne and placed her in charge of Officer Moseley, who testified she was crying; that the left side of her face had marks on it; her arm was black and blue and her hair and dress "were all wet with the odor of alcohol coming off it."

Under all the evidence it is not surprising the jury believed Miss Kelly and rejected appellant's denials of any improper conduct toward her.

2. The first ten assignments of error are of the same general character and charge that the trial judge unduly restricted the cross-examination of the witnesses Seggern, Livesey and Dooling, the proprietor of the King Kole Tavern. They had been called by the Commonwealth and interrogated with reference to their whereabouts at the time some of the incidents described by Miss Kelly occurred. The ground of the objection to

certain questions asked them by counsel for appellant during their cross-examination was that those questions were outside of the legitimate scope of cross-examination and constituted an attempt to introduce appellant's defense by cross-examination of the Commonwealth's witnesses. In sustaining the objections, the trial judge stated these witnesses could be called by appellant upon his side of the case; they were so called and testified at length with relation to the matters which his counsel had sought to introduce by way of cross-examination. We cannot see that appellant was prejudiced in any way by the rulings. These matters were within the discretion of the trial judge and the complaint that he abused that discretion is without merit. *Cf. Com. v. Flori*, 300 Pa. 125, 150 A. 290, and *Com. v. Sheehan*, 76 Pa. Superior Ct. 128.

The only additional assignment justifying attention is the thirteenth. It relates to the refusal of the trial judge to withdraw a juror because of an alleged prejudicial remark of the assistant district attorney who conducted the trial. Among other things testified to by appellant was that as Miss Kelly left the cab she said, "You s— of a b—; I will make you pay for this."

When Matthews, the cab driver, testified at length for the Commonwealth relative to the manner in which Miss Kelly was shoved out of his cab by appellant he made no reference to any such remark upon her part. After appellant had testified in his own behalf, Matthews was called and asked by appellant's counsel whether he heard her say anything as she left the cab. The witness answered, "I'll get you, you s— of a b—. That's what she said." Upon cross-examination he admitted he had been interviewed by the representatives of the Commonwealth immediately after the institution of the prosecution and had given them a statement. An excerpt from his cross-examination reads: "Q. Why didn't you say that? A. I wasn't asked that question. Q. Oh, you weren't asked that question? A. No. Q. You

were asked to tell everything that took place? A. I forgot it; I didn't remember it. Q. *Who paid you to remember it?"* (Italics supplied.)

The motion to withdraw the juror was based upon the italicized remark. In refusing the motion the trial judge said: "The jury will not pay any attention to that question. Eliminate it from the case. It is not to be to the prejudice of the defendant at all."

The remark was improper and should not have been made, but we are not persuaded, particularly in the light of the instruction of the trial judge to the jury to disregard it, that the refusal to withdraw a juror constituted reversible error. See *Com. v. Massarelli,* 304 Pa. 335, 339, 156 A. 101, and *Com. v. Wilcox,* 112 Pa. Superior Ct. 240, 170 A. 455, affirmed, 316 Pa. 129, 173 A. 653. We have examined all the assignments and are not convinced any of them should be sustained.

Judgment affirmed, and it is ordered that the appellant appear in the court below at such time as he may there be called and that he be by that court committed until he has complied with the sentence or any part thereof which had not been performed at the time his appeal was made a supersedeas.