J-S30015-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| GILBERT NEWTON, III | |
| Appellant | No. 206 EDA 2022 |

Appeal from the Judgment of Sentence Entered September 29, 2021
In the Court of Common Pleas of Montgomery County
Criminal Division at No.: CP-46-CR-0004802-2020

BEFORE: STABILE, J., MCCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY STABILE, J.: **FILED DECEMBER 9, 2022**

Appellant Gilbert Newton, III appeals from the September 29, 2021 judgment of sentence entered in the Court of Common Pleas of Montgomery County ("trial court"), following his jury convictions for first-degree murder and possession of an instrument of crime.[1] Upon review, we affirm.

In connection with the stabbing death of his 19-year-old ex-girlfriend, Appellant was charged with the foregoing crimes. The case eventually proceeded to a multi-day jury trial, at which both the Commonwealth and Appellant presented witness testimony. The trial court detailed the evidence adduced at trial as follows:

> First to testify was Officer Ryan Hasara of the Abington Township Police Department. On July 27, 2020 at about 8:14 a.m., Officer

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(a) and 907(a), respectively.

Hasara was dispatched to the Meadowbrook Train Station. When he arrived at the overflow lot of the train station, the officer observed a blue RAV4, and a female laying to the left of the vehicle on the ground. Officer Hasara knew from all of the blood loss and trauma to the body that the victim could not be revived. He ran the vehicle's registration and determined that it belonged to Morgan McCaffery. Both the front and back driver's side doors were open, and inside the vehicle there was a large, sharp, kitchen knife on the front passenger floorboard.

Juan Jose Vasquez was next to testify. On July 27, 2020, he was driving his work truck through the train station parking lot and saw a man on top of a woman, kneeling. Mr. Vasquez stopped and when he exited his truck, the man ran to a white Jeep, and drove off quickly. Mr. Vasquez got about ten feet away from the woman who was laying there, and all he could see was that blood was coming out of her forehead. He told a driver of a passing trash truck to call police.

Carnell Kemp, a worker for the Abington Township Refuse Department, testified that on July 27, 2020, he used the Meadowbrook Train Station at Lindsay Lane as a turn-around in his trash pick-up route. When he was there, a man flagged him down, and he pulled over. When he looked up, he saw a motionless person on the ground. Mr. Kemp called his supervisor, who in turn called 9-1-1. He remained on the scene until police arrived.

Sergeant David Wiley of the Abington Township Police Department, who was a patrolman at the time of the incident, testified that on July 27, 2020, he responded to the Meadowbrook Train Station at about 8:14 a.m. When he arrived on-scene there was a female, who was later identified as Morgan McCaffery, laying on her back with her arms and legs extended. She was covered in blood, and had several traumatic wounds to her face, arms, and torso. He checked her status and there were no signs of life. Sergeant Wiley spoke with Mr. Vasquez who informed him of what he had seen, namely that a tall, skinny, male was standing overtop the victim, and that when he got out of his truck, the male ran to a white Jeep and left the scene at a high rate of speed. As the officer was gathering this information, he was broadcasting it over the radio to the officers en route to the scene. Sergeant Wiley assisted Officer Hasara and located blood spots on the gravel on the driver's side, and then to the right of the vehicle he

noticed skid marks in the gravel. He remained on-scene while the Abington Township detectives and Montgomery County detectives processed the scene.

Dr. Gregory McDonald, the chief deputy coroner for Montgomery County, testified. On July 27, 2020, Dr. Ian Hood performed an autopsy on the victim, at which time he took notes and photographs and collected evidence. Dr. McDonald performed an independent review of the file. He testified that the victim sustained multiple stab and slash wounds to multiple areas of her body, including the face, neck, chest, back abdomen, and her arms; and the doctor concluded that she died from these wounds, and the manner of death he determined to be homicide. The victim had about 23 stab/slash wounds to her face and scalp, 14 wounds to her neck, four stab wounds to her chest, a single stab wound to her abdomen, three stab wounds to her back, and seven stab wounds to her arms. Dr. McDonald opined that there were several wounds to the neck, involving the carotid artery that could have been fatal. The doctor also identified four stab wounds to the chest, and one of which was fatal in and of itself. That stab wound went through the right side of the victim's heart. Death would have ensued within minutes, with just that injury alone. The victim also had defensive injuries to her arms and hands. The doctor opined that given all of the victim's injuries, the victim could have only survived several minutes at most from the initial attack.

Michele Cordalis who worked at the police administration building as a 9-1-1 dispatcher testified that on July 27, 2020, a call came in at 10:01 a.m., and that police responded to 8507 Ferndale Street.

Officer Thomas Purcell of the Philadelphia Police Department responded to that location within two minutes, along with Officer Ernest Griffin. When they arrived they went to the door of that residence, they encountered a female. She told them her son was inside covered with blood and was acting strangely. The officer spoke with Appellant, and asked him if he was okay, to which Appellant told the officer that he had just stabbed his girlfriend multiple times and that he d[id not] want to be in this world anymore. Officer Griffin handcuffed Appellant, and he was placed in the patrol wagon to be transported to a hospital. Officer Purcell saw Appellant's white Jeep. He observed blood on the driver's side door.

Detective Philip Geliebter of the Abington Township Police Department was called to assist with the investigation into the homicide. On July 27, 2020, he responded to Abington hospital at about 10:45 a.m., where Appellant was taken. Detective Geliebter secured Appellant's clothing as evidence, and took photographs of his injuries.

Lieutenant Edward Schikel, a detective with the Montgomery County Detective Bureau, was accepted as an expert in forensic crime scene investigation and methodology pertaining to evidence recovery, preservation, and analysis. At the time of July 27, 2020, he was a detective in the forensic investigation unit and was the primary detective assigned to process the crime scene at the Meadowbrook Train Station with a team of detectives. He responded to the scene at 9:30 a.m. At the scene, near the victim's vehicle, he identified a pair of sneakers, a pool of blood about one foot by three feet, a bent serrated knife blade about two and three-quarter inch, a broken knife blade, and blood extending from the blood pool to 16 to 20 feet to the victim's body. The victim's RAV4 was still running when Lieutenant Schikel arrived at the scene. The driver's door was completely open and the driver's side rear door was somewhat open. The detective found a knife inside the RAV4 vehicle. It was a Ginsu style knife with an eight inch blade, and it was bloodstained. A knife handle with a small portion of the blade attached was found underneath the victim's body. The knife handle with the partial blade looked to be from the same knife as the broken blade found in the pool of blood.

Detective Terrance Lewis of the Montgomery County Detective Bureau—Forensic Services Unit testified that on July 27, 2020, he was assisting Lieutenant Schikel, and after he assisted at the crime scene, he went to 8507 Ferndale Street to photograph and recover any evidence. Inside the home he recovered a knife block, manufactured by Ginsu. Detective Lewis noted that several knives from the knife block were missing, there were empty slots when he found it. The knives from the scene are also labeled with "Ginsu." The detective processed the exterior of Appellant's white Jeep for evidence, and found several locations of blood stains. He also processed the interior Jeep pursuant to a search warrant, where he also found several locations of blood stains. Further, Detective Lewis processed the victim's vehicle. There was blood on the front passenger interior door, front passenger seat, by the glove compartment, handle area of the front passenger door.

Detective William Mitchell of the Montgomery County Detective Bureau, testified as an expert in the field of historical call detail record analysis. The victim's phone was recovered from her vehicle by police. Appellant's cell phone was recovered from his person at the hospital. Detective Mitchell requested subscriber information the victim's phone and Appellant's phone from February 1, 2020 through July 28, 2020. He also downloaded the phones. He further issued search warrants for the social media companies, Facebook, Instagram, and Snapchat that were relevant to the investigation. Detective Mitchell read out some of these texts and social media app messages indicating that as of June 19, 2020, the victim wanted to end the relationship, and that as of June 20, 2020 they were no longer together as a couple.

However, the texting and messaging through the various apps continued in the following days. These messages revealed that their relationship at that point and at the time prior to the break-up was tumultuous and that there was a lot of arguing and name calling between them. They further showed that Appellant was having a difficult time accepting the break up. In particular, on June 20, 2020, starting at about 11:43 p.m., there was a volley of text messages in which Appellant told the victim, "Okay. Well, I'm not your pet, so fuck off. I hope you honestly die at this point. Like I just want to stab you in the neck continuously. I might actually to be honest. Have your head on a swivel constantly." Starting on July 5, 2020 at 4:16 a.m. and continuing through the following day, Appellant texted his mother in part as follows:

> [Appellant]: Did she send them to you? I just won't do it. I wanna stab this girl in the fucking neck, dude.
>
> Mother: Gil.
>
> [Appellant]: If she doesn't come back to me, mark my words, I'm going to do everything in my power to shit on her life.
>
> . . . .
>
> [Appellant]: Mom, please. I'm so down. Stop talking to dad about it. She isn't going to unblock me. I think she's done for real. That can't happen.
>
> . . . .

- 5 -

> [Appellant]: Okay. That's fine. I'm hurt. Just let me be for a few days. Mom, you better text her and tell her to see me face to face so I know it's for real. Or there's gonna be problems. I'm not doing this.
>
> Mother: Gil, I'll text her. But if she says it's over, you need to move on.
>
> [Appellant]: Okay. That's fine. Say all he wants to do is either text him or see him face to face and say it's for real. I'm never giving anyone a chance.
>
> Mother: I'll tell her you want to talk to her and won't fight. But if you start fighting with her and acting like an asshole, she will just block you again.
>
> [Appellant]: Okay. That's fine. I haven't wanted to fight. I just want her back. All I want. If she can't do that, then I'll never talk to her again. That simple.

On July 6, 2020, the text conversation continues:

> [Appellant]: Because I want to talk to her. Say he will text you when you get home. Just unblock him. She's got an attitude like it's really done. I'm really gonna fucking kill her dude. I will stab her in the neck 57 times.

Appellant's mother replied, "See. Now you're already getting aggressive."

> [Appellant]: I won't act like that when we text. But just know if she does this for real, then shows up to our house one day, I'm shoving her face-first into the cement. Wasted a whole year. I could have been doing some other shit.

Following that exchange, there are several phone calls from Appellant's mother's phone to the victim's phone, all of which went unanswered.

On July 8, 2020, the victim initiated contact with Appellant. In that text conversation, the victim states that she wants to return some of his possessions to him. He agrees that he wants them back, and proposes Sunday to meet up. On July 13, 2020, Appellant and the victim had a text conversation, in part where they are arranging for the victim to drop the items she had off at

his house later that day, which Snapchat location information confirmed that the victim did in fact stop by his house. There was additional text conversation on July 17, 2020.

A day before the murder on July 26, 2020, there was a series of communications, in which, in part, at 9:25 p.m., Appellant sent a photograph to his mother of the victim with her new boyfriend. A minute later, Appellant texted the victim about her having a new boyfriend. Appellant was upset that she had moved on. At 9:26 p.m. Then the following conversation ensued:

[Appellant]: When can we meet in person?

Morgan: When do you want to?

[Appellant]: Up to you. So you have no desire of even thinking about getting back with me? Tomorrow I'm going to the field near your house.

Morgan: Okay. What time?

[Appellant]: Can I ask a question?

Morgan: What?

[Appellant]: Did you have sex with him? Just be honest. And whatever time you are available.

Morgan: None of your business.

[Appellant]: So you did. That's disgusting, Morgan.

Morgan: Didn't say that.

[Appellant]: We will talk tomorrow. What time?

Morgan: 7:30?

[Appellant]: In the morning?

Morgan: Yeah.

[Appellant]: How about 10:00. So did you have sex with him? Just be honest with me. I'll be there at ten o'clock.

Morgan: I'll be there at 7:30. Take it or leave it.

[Appellant]: Okay. Can you just answer the question.

Morgan: What does that matter.

[Appellant]: Because it does. Can you just tell me the truth.

Morgan: Then there's no need to meet tomorrow.

[Appellant]: Why? I'll be there at 7:30.

Morgan: How the fuck did you find my VSCO?

[Appellant]: I been knew it. I was on it. I was really working on myself for you, too. I guess that's out of the picture now.

Morgan: You should have been working on yourself for yourself, not for me. It's not healthy at all.

[Appellant]: You in love with this guy?

Morgan: No.

[Appellant]: Do you love me?

Morgan: I still care about you and you will always always have a place in my heart.

[Appellant]: So you would never be able to have me as your lover again? I really don't get it.

[Appellant]: I will be there at 7:30.

[Appellant]: Answer the question.

Morgan: Nevermind [(sic)] about tomorrow. You and your mother need to stay the fuck out of my life. You need to never contact me ever again. I'm blocking you.

During this time in the text conversation, there was a Facebook message from Appellant's mother to the victim's Facebook page via Facebook messenger.

[Appellant]: No. I want to meet tomorrow. Relax. I'll be there at 7:30.

- 8 -

Morgan: No, I'm done.  You and your mother need to leave me the fuck alone.

[Appellant]: Take my mom off the picture.  I'll see you tomorrow at 7:30.

Morgan: No.  Fuck you.  Leave me alone.

[Appellant]: I'll be there at 7:30, Morgan.  Relax.

Morgan: No.  Fuck off.

[Appellant]: She did this, not me.  I'll be there at 7:30.

Morgan: No.  Fuck off, dude.  You both can leave me the fuck alone and stay the fuck out of my life.  I have been so fucking happy with my life.  Leave me alone.

[Appellant]: I didn't tell her to text you, I really didn't.  I'll be there at 7:30.

Morgan: Even in our fucking relationship, you told her everything.  You have her get the fuck involved.  You all leave to leave me alone and stay the fuck out of my business.

[Appellant]: Just relax.  You literally want to come talk to me about this.  Cut my mom out of this.  She is crazy.

Morgan: No, I'm done, dude.  I wanted to talk in person because it was respectful, but now I don't care.

[Appellant]: Can you tell me what we would've talked about, how you found someone better?  I want to talk in person one last time out of respect without my mom involved.  The least you can do.

Morgan: No.  Your mom ruined that, just like she ruined your chance.

[Appellant]: I know she did.

Morgan: Have a nice one, Gil.  I wish you the best, but you gotta leave me the fuck alone.

- 9 -

[Appellant]: I want to see you tomorrow in person one last time to talk. Just please do that for me.

Morgan: No.

[Appellant]: Why?

Morgan: You mom ruined that.

[Appellant]: It would be just me there, not her. You weren't coming back anyway. I just want to talk. So if she wasn't harassing you, you probably would have come back? Just meet me there at 7:30.

[Appellant]: I had one last thing to give you anyway. Is that okay? The least you can do, Morgan.

Morgan: No. I'm a piece of shit. I'm a coward. I'm disgusting. I'm good, but thanks.

[Appellant]: I just flipped out on my mom. I told her I will never forgive her. So get my mom out of it. It's just between me and you. I'll see you at 7:30.

Morgan: No. I don't care. Your mom involved herself too much at this point pint. Sorry, Gil, but you I'm not meeting you tomorrow.

[Appellant]: I don't think of you as any of that. I'll drive to you.

Morgan: No. Please don't.

[Appellant]: Morgan, seriously.

Morgan: What. Your mom is beyond disrespectful. She crossed the line too many times.

[Appellant]: That just shows you don't care about me because I gave you a whole year. Get her out of the picture. I just want to talk to you. I don't claim my mom.

Morgan: How can I get her out of the picture? She fucking involves herself and you involved her.

[Appellant]: I didn't.  I just told her because she kept asking me how it was going because she saw how hurt I was.  Just get her out of the picture and meet me tomorrow.

[Appellant]: I gave you everything I got.  Least you can do is see me tomorrow.

Morgan: Nah, sorry.  You and her kinda put her in the picture.

[Appellant]: You really like this kid more than me?  What were you saying to him about me today?  That was the kid you were FaceTime though.  I'll see you tomorrow at 7:30 at the filed or your house.

Morgan: I never FaceTime some kid though.  I told you that.

[Appellant]: So you have more feelings for this kid than me?

Morgan: Met this kid after we were done.

[Appellant]: He makes you happier?  We meeting tomorrow or no?  I want to talk to you in person.

Morgan: He makes me happy, yes.

[Appellant]: It's the mature thing to do.

Morgan: Fine, Gil.

[Appellant]: Okay.  Happier than me?  Nevermind [(sic)].  We will talk about it tomorrow at 7:30.  I'll see you there.

Morgan: You gonna tell your mom everything, too?

[Appellant]: No, I won't.  She just asked how it was going.  I said she found someone new.  That's all.  That's who I went to when I was in pain, but not anymore.

Morgan: Probably will, cracking the fuck up.

[Appellant]: I won't.

Morgan: Yeah. Whatever. Just saying she makes herself look like this immature mom, so.

[Appellant]: She doesn't need to know anything. She knows you will never come back to me. It doesn't matter. I told her I'm done with her.

Morgan: I always liked her and respected her. I don't know why she thinks it's okay to disrespect me.

[Appellant]: She ruined the best thing that happened to me. So she ruined us? Like even if there was some way for yous to get along.

Morgan: I'm very much done.

[Appellant]: Nevermind [(sic)]. We will talk about it tomorrow. That's fine.

On July 27, 2020, the day of the murder, there was additional phone activity between Appellant and the victim. Starting at 6:52 a.m., the victim texted Appellant but could not get ahold of him. At 7:34 a.m., Appellant texted her stating, "I'm sorry. I fell asleep. I'll be there soon. I'm coming now. Please."

Morgan: You have until 45. Then I'm leaving.

[Appellant]: Church parking lot.

Morgan: At the track.

[Appellant]: Nah, church more private. This is in person. In person.

Morgan: Fine. You have nine minutes. Four minutes.

[Appellant]: Red light. Nothing I can do. I'm almost there. Relax. Just please stay. I already halfway there. Going under the bridge now.

Morgan sent another text stating that there is another car at the church location. [Appellant] suggested going to a more private place, and then they decided to go to the train parking lot. According to cell site location, Morgan was at the train station at 7:55 a.m. The last activity from the victim's phone was at 8:06 a.m., when she called her mother, but the call did not go through. The 9-1-1 call occurred at 8: 12 a.m.

At 8:51 a.m., Appellant texted his mother, "Mom, I killed Morgan about an hour ago." Appellant explained, "I constantly had sick thoughts in my head. I couldn't do it anymore. I love you guys so much. I had the biggest heart, no brains. That was the problem. You guys couldn't do anything else." His mother was in disbelief, to which Appellant responded, "I'm sick in the head. There was no stopping me." At 9;06 a.m., Appellant texted, "Mom, I stabbed her repeatedly."

On cross-examination, Detective Mitchell acknowledged that on July 17, 2020, Appellant had sent several text messages expressing suicidal thoughts. After Detective Mitchell's testimony, the Commonwealth rested its case.

The defense presented numerous character witnesses, including, Richard McCollick, Harry Dumas, David Hoftiezer, Wilton Benson, Charles McCormick, Gilbert Newtwon, Jr. (Appellant's father), and Judy Newton.

Next, Appellant testified on his own behalf. He testified that he wanted to meet up with the victim because he wanted to see if she really cared about him, and to find out whether she was sleeping with another man. He explained that if she was sleeping with another man he was going to kill himself, in front of her. He wanted to see if she would intervene as a test of whether she cared. It was his plan to stab himself in the neck as many times as he could. Appellant testified that he brought two kitchen knives with him, and that he just grabbed them right before he left his house. He put them in the pouch of his hoodie. When Appellant and the victim both arrived at the train station, he got into her car, and they started to talk. Appellant admitted that at that time he loved the victim, and that he was upset. The victim had a bag with items belonging to Appellant, so she exited the front driver's side and opened the rear driver's side door to retrieve the bag. That is when Appellant pulled the knives out, and placed them on both sides of his legs. Appellant asked her if she with the other guy and Appellant explained the victim's response as follows:

> She said—she said she was definitely sleeping with him and she was definitely trying to start something new with him, and that she kind of—you know, she kind of chuckled at me because, once that was said, I asked her, like why? Like why is this happening? I thought we were supposed to be together forever and that we were both—we both came into the relationship

as virgins because it was just so—it's just so hard to find someone nowadays that hasn't been dating around. So it was just like—it felt like it was meant to be and we both really cared for each other. And I just—she said that it was hilarious that I thought that that was the truth, that we were both virgins for each other, and that she had lots of sex before she dated me and that she was going to have a lot of sex after she was done with me.

Appellant testified that this made him really upset and that the anger started to kick in after hearing this. He called the victim a fucking whore. The victim turned and smacked and spit on him. Appellant explained the effect this had on him, testifying, "And it just got to the point where I just—as soon as she slapped me and spit on me, I just—it went through my mind like—like she must really not care about me. And I just—I got so upset that I grabbed the knife and I just starting stabbing her." After Appellant's cross-examination, the defense rested. The defense concluded its evidence.

After the jury was excused, defense counsel asserted that the jury should be instructed on voluntary manslaughter. The Commonwealth rejected this argument. This court denied the request and provided reasons for the denial on the record.

At the start of the third day of trial, defense counsel requested that this court reconsider its ruling on the voluntary manslaughter jury instruction. . . . This court having reviewed these cases, reaffirmed its ruling, and provided additional reasons for the denial on the record.

At the conclusion of the trial, the jury returned a verdict of guilty of first-degree murder and possession of an instrument of crime. Appellant proceeded immediately to a sentencing hearing. Appellant was sentenced to a life term of imprisonment. On October 6, 2021, a timely post-sentence motion was filed, and denied. A timely direct appeal was not filed. On January 4, 2022, a petition seeking post-conviction relief pursuant to the Post-Conviction Relief Act, 42 Pa.C.S.A. §§ 9541-9546, was filed requesting the [*nunc pro tunc*] reinstatement of Appellant's direct appeal rights, which was granted on January 6, 2022. Accordingly, a notice of appeal was filed that same day.

- 14 -

Trial Court Opinion, 3/21/22, at 1-20 (record citations, quotation marks and unnecessary capitalizations omitted). Both Appellant and the trial court complied with Pa.R.A.P. 1925.

On appeal, Appellant argues only that the trial court erred "in denying [his] request for a voluntary manslaughter—heat of passion jury instruction[.]" Appellant's Brief at 3.

With regard to Appellant's challenge to the denial of jury instructions, we initially note:

> Our standard of review in regard to a trial court's decisions on jury instructions is well-settled: "[O]ur standard of review when considering the denial of jury instructions is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." *Commonwealth v. Galvin*, 603 Pa. 625, 651, 985 A.2d 783, [798-99] (2009).

*Commonwealth v. Cannavo*, 199 A.3d 1282, 1286 (Pa. Super. 2018), *appeal denied*, 217 A.3d 180 (Pa. 2019). Further, "[t]he trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the Appellant was prejudiced by that refusal." *Commonwealth v. Sandusky*, 77 A.3d 663, 667 (Pa. Super. 2013) (quoting *Commonwealth v. Thomas*, 904 A.2d 964, 970 (Pa. Super. 2006) (citation omitted)).

A perpetrator may commit voluntary manslaughter if he kills another while, *inter alia*, "acting under a sudden and intense passion resulting from serious provocation by" the victim. 18 Pa.C.S.A § 2503(a)(1). Thus, voluntary manslaughter contemplates an intentional killing wherein the

- 15 -

defendant harbors a specific intent to kill. *See Commonwealth v. Patton*, 936 A.2d 1170, 1179 (Pa. Super. 2008). A jury instruction for voluntary manslaughter concerning "heat of passion" is appropriate where the evidence suggests "that, at the time of the killing, [a]ppellant acted under a sudden and intense passion resulting from serious provocation by the victim." *Commonwealth v. Sanchez*, 82 A.3d 943, 979 (Pa. 2013) (citation omitted). "If any of these be wanting—if there be provocation without passion, or passion without a sufficient cause of provocation, or there be time to cool, and reason has resumed its sway, the killing will be murder." *Id.* at 980 (citation and internal quotation marks omitted).

Here, after careful review of the record, and the relevant case law, we conclude that the trial court accurately and thoroughly addressed the merits of Appellant's claim. *See* Trial Court Opinion, 3/21/22, at 20-28. The evidence in this case revealed that, prior to stabbing the victim to death, Appellant was not shy about his desire to kill the victim or how he would do it. He texted the victim: "I hope you honestly die at this point. Like I just want to stab you in the neck continuously. I might actually to be honest." N.T., Trial, 9/28/21, at 61. He also texted his mother, stating "I wanna stab this girl in the fucking neck, dude." *Id.* at 76. Later, Appellant elaborated: "I'm really gonna fucking kill her dude. I will stab her in the neck 57 times." *Id.* at 80. Indeed, the night before the murder, Appellant texted his mother that the victim "better come back or I'll cut her head off." *Id.* at 94.

The record reveals that, after persistent efforts, Appellant finally persuaded the victim to meet him one last time. On his way out the door, he grabbed two knives. Upon learning that there were people at the first location, Appellant asked the victim to go to another location that was more private. Once there, Appellant claimed that he called the victim a whore. According to Appellant, she slapped and spat on him. Appellant, in turn, stabbed her more than thirty times, including fourteen stab wounds to the neck. He explained: "as soon as she slapped me and spit on me, I just—it went through my mind like—like she must really not care about me. And I just—I got so upset that I grabbed the knife and I just started stabbing her." *Id.* at 158. As the Commonwealth keenly points out, Appellant was not provoked by the victim slapping and spitting on him. Commonwealth's Brief at 16. Rather, "it was his realization that she was really moving on" that made him stab the victim. *Id.*

Moreover, about forty minutes after the murder, Appellant texted his mother: "I **constantly** had sick thoughts in my head. I couldn't do it anymore." N.T., Trial, 9/28/21, at 115 (emphasis added). He reasoned: "I'm really sick in the head. I just held it in for so long." *Id.* Appellant later added: "I'm sick in the head. There was no stopping me." *Id.* at 116.

Based upon our review of the evidence presented in this case, we cannot conclude that the trial court abused its discretion in denying a voluntary manslaughter instruction. Appellant expressed his desire to kill the victim in text messages sent before and after the murder. Thus, he was not someone

who was acting under a sudden and intense passion resulting from serious provocation by the victim. *See Commonwealth v. Carter*, 466 A.2d 1328, 1332-33 (Pa. 1983) (a defendant must "establish that the trial evidence would 'reasonably support' a verdict based on the desired charge and may not claim entitlement to an instruction that has no basis in the evidence presented during trial.").

Insofar as Appellant relies on *Commonwealth v. Harris*, 372 A.2d 757 (Pa. 1977) and *Commonwealth v. Voytko*, 503 A.2d 20 (Pa. Super. 1986) to compel a different outcome, such reliance is misplaced because the case *sub judice* is distinguishable. In *Harris*, our Supreme Court held that the trial court erred in denying a voluntary manslaughter instruction because there was evidence which supported a jury finding that the defendant killed the victim in response to provocation. *See Harris*, 372 A.2d at 758-59. The defendant had established that the victim struck him in the head with a cane immediately following a failed drug purchase. The defendant then drew a knife he always carried with him and stabbed the victim several times. If accepted as true by the jury, these circumstances would show that the defendant was provoked by the victim before stabbing him, and that he did so without a cooling-off period. A voluntary manslaughter instruction was, therefore, warranted. *See id.*

Here, in contrast to *Harris*, Appellant made a decision to bring two knives to his early morning meeting with the victim on July 27, 2021. Further,

unlike the defendant in *Harris*, Appellant desired to kill the victim for some time prior to the last meeting, as demonstrated by the evidence herein.

In *Voytko*, this Court held that the jury received an inadequate instruction on voluntary manslaughter because the trial court did not explain how a serious provocation may be based on "the cumulative effect of a series of related events." *Voytko*, 503 A.2d at 23. There, the defendant had confronted his spouse as she arrived at her parents' home, having been driven there by the victim, her paramour. The defendant became enraged, started screaming, and then fatally shot the victim in the head. Prior to the shooting, the defendant had "found his wife in an act of adultery with [the victim], had physically fought with [the victim], had argued with his wife, had been deserted by his wife, and finally, had found her in [the victim's] company, returning from a date, at 5:00 a.m." *Id.* at 23. A new trial was mandated because the "trial court's instructions did not at any time or in any manner tell the jury" it could consider whether all of those circumstances could have satisfied the serious provocation element of voluntary manslaughter. *Id.*

Unlike the defendant in *Voytko*, Appellant never caught the victim cheating on him, and he never observed her with her new boyfriend. The victim here ended her relationship with Appellant after less than a year, and

then Appellant repeatedly asked her for an in-person meeting while expressing to others, including the victim, that he wanted to stab her in the neck.[2]

In sum, we conclude that the trial court did not abuse its discretion in denying Appellant's request for a voluntary manslaughter instruction because the evidence of record simply did not warrant one. Accordingly, we affirm Appellant's September 29, 2021 judgment of sentence. We further direct that a copy of the trial court's March 21, 2022 Rule 1925(a) opinion be attached to any future filings in this case.

Judgment of sentence affirmed.[3]

---

[2] The Commonwealth points out that, unlike the defendants in **Harris** and **Voytko**, Appellant's attack on the victim was vicious.

> Despite opportunities for him to give [the victim] a chance to survive, he did everything in his power to ensure she would not. After [Appellant] began stabbing her, she managed to get out of the vehicle. [Appellant] pursued her, stabbed her in the back as she tried to escape, and stabbed her repeatedly as he kneeled over her. There was no evidence that [Appellant] was seriously provoked such that he was incapable of cool reflection. At most, assuming [Appellant] testified truthfully, [the victim] slapped him and spit on him after he called her a whore.

Commonwealth's Brief at 18. Appellant only stopped stabbing her when a passerby showed up.

[3] Judge McCaffery is not related to the victim, Morgan McCaffery, in this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/9/2022

OPINION

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY
PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA :          CP-46-CR-0004802-2020

        V.                :

GILBERT NEWTON, III         :          **206 EDA 2022**

**1925(a) OPINION**

**CARPENTER  J.**                       **MARCH 21, 2022**

INTRODUCTION

Appellant, Gilbert Newton, III, appeals from the judgment of sentence entered on September 29, 2021, following his conviction of first-degree murder and possession of an instrument of crime. A life term of imprisonment was imposed.

Appellant's convictions arose out of the July 27, 2020, stabbing death of his 19 year-old ex-girlfriend, Morgan McCaffery, at the Meadowbrook Train Station in Abington Township, Montgomery County. On that date, Appellant met the victim there armed with two Ginsu kitchen knives. The victim was stabbed over 30 times, including 14 stab wounds to her neck and four stab wounds to her chest. Appellant fled the scene and when the police arrived they found the victim's lifeless body.

At trial, the defense claimed that Appellant had been suicidal over their breakup. The theory of the defense was that Appellant went to meet the

victim that morning, with the knives, to kill himself in front of her. He asserted that the killing was voluntary manslaughter and not murder.

On appeal, Appellant's sole issue is whether this Court erred in denying his request for a voluntary manslaughter jury instruction.

FACTUAL AND PROCEDURAL HISTORY

On September 27, 2021, the three-day jury trial began at which the following facts were adduced. First to testify was Officer Ryan Hasara of the Abington Township Police Department. (N.T, Trial by Jury – Day 1, 9/27/21, p. 32). On July 27, 2020 at about 8:14 a.m., Officer Hasara was dispatched to the Meadowbrook Train Station. Id. at 33, 38. When he arrived at the overflow lot of the train station, the officer observed a blue RAV4, and a female laying to the left of the vehicle on the ground. Id. at 35, 39. Officer Hasara knew from all of the blood loss and trauma to the body that the victim could not be revived. Id. at 39. He ran the vehicle's registration and determined that it belonged to Morgan McCaffery. Id. at 41.

Both the front and back driver's side doors were open, and inside the vehicle there was a large, sharp, kitchen knife on the front passenger floorboard. Id. at 42.

Juan Jose Vasquez was next to testify. On July 27, 2020, he was driving his work truck through the train station parking lot and saw a man on top of a woman, kneeling. Id. at 49, 50 - 51. Mr. Vasquez stopped and when he exited his truck, the man ran to a white Jeep, and drove off quickly. Id. at 51 –

2

52. Mr. Vasquez got about ten feet away from the woman who was laying there, and all he could see was that blood was coming out of her forehead. Id. at 52. He told a driver of a passing trash truck to call police. Id.

Carnell Kemp, a worker for the Abington Township Refuse Department, testified that on July 27, 2020, he used the Meadowbrook Train Station at Lindsay Lane as a turn-around in his trash pick-up route. Id. at 55 – 56. When he was there, a man flagged him down, and he pulled over. Id. at 56. When he looked up, he saw a motionless person on the ground. Id. at 56, 58. Mr. Kemp called his supervisor, who in turn called 9-1-1. Id. at 57. He remained on the scene until police arrived. Id.

Sergeant David Wiley of the Abington Township Police Department, who was a patrolman at the time of the incident, testified that on July 27, 2020, he responded to the Meadowbrook Train Station at about 8:14 a.m. Id. at 61 – 62. When he arrived on-scene there was a female, who was later identified as Morgan McCaffery, laying on her back with her arms and legs extended. Id. at 63 – 64, 65. She was covered in blood, and had several traumatic wounds to her face, arms, and torso. Id. at 64. He checked her status and there were no signs of life. Id. at 64, 65. Sergeant Wiley spoke with Mr. Vasquez who informed him of what he had seen, namely that a tall, skinny, male was standing overtop the victim, and that when he got out of his truck, the male ran to a white Jeep and left the scene at a high rate of speed. Id. at 65. As the officer was gathering this information, he was broadcasting it over the radio to the officers *en* route to the scene. Id. at 66 – 67.

3

Sergeant Wiley assisted Officer Hasara and located blood spots on the gravel on the driver's side, and then to the right of the vehicle he noticed skid marks in the gravel. Id. at 67. He remained on-scene while the Abington Township detectives and Montgomery County detectives processed the scene. Id. at 69.

Dr. Gregory McDonald, the chief deputy coroner for Montgomery County, testified. Id. at 73. On July 27, 2020, Dr. Ian Hood performed an autopsy on the victim, at which time he took notes and photographs and collected evidence. Id. at 78. Dr. McDonald performed an independent review of the file. Id. He testified that the victim sustained multiple stab and slash wounds to multiple areas of her body, including the face, neck, chest, back abdomen, and her arms; and the doctor concluded that she died from these wounds, and the manner of death he determined to be homicide. Id. at 81. The victim had about 23 stab/slash wounds to her face and scalp, 14 wounds to her neck, four stab wounds to her chest, a single stab wound to her abdomen, three stab wounds to her back, and seven stab wounds to her arms. Id. at 82 – 83. Dr. McDonald opined that there were several wounds to the neck, involving the carotid artery that could have been fatal. Id. at 88. The doctor also identified four stab wounds to the chest, and one of which was fatal in and of itself. Id. at 90. That stab wound went through the right side of the victim's heart. Id. Death would have ensued within minutes, with just that injury alone. Id. The victim also had defensive injuries to her arms and hands. Id. at 91. The

4

doctor opined that given all of the victim's injuries, the victim could have only survived several minutes at most from the initial attack. Id. at 93.

Michele Cordalis who worked at the police administration building as a 9-1-1 dispatcher testified that on July 27, 2020, a call came in at 10:01 a.m., and that police responded to 8507 Ferndale Street. Id. at 98.

Officer Thomas Purcell of the Philadelphia Police Department responded to that location within two minutes, along with Officer Ernest Griffin. Id. at 101- 102, 114 - 115. When they arrived they went to the door of that residence, they encountered a female. Id. at 104. She told them her son was inside covered with blood and was acting strangely. Id. at 104. The officer spoke with Appellant, and asked him if he was okay, to which Appellant told the officer that he had just stabbed his girlfriend multiple times and that he doesn't want to be in this world anymore. Id. at 106, 107. Officer Griffin handcuffed Appellant, and he was placed in the patrol wagon to be transported to a hospital. Id. at 107, 110. Officer Purcell saw Appellant's white Jeep. Id. at 108. He observed blood on the driver's side door. Id.

Detective Philip Geliebter of the Abington Township Police Department was called to assist with the investigation into the homicide. Id. at 120 – 121. On July 27, 2020, he responded to Abington hospital at about 10:45 a.m., where Appellant was taken. Id. at 121. Detective Geliebter secured Appellant's clothing as evidence, and took photographs of his injuries. Id. at 122.

5

Lieutenant Edward Schikel, a detective with the Montgomery County Detective Bureau, was accepted as an expert in forensic crime scene investigation and methodology pertaining to evidence recovery, preservation, and analysis. Id. at 127, 133. At the time of July 27, 2020, he was a detective in the forensic investigation unit and was the primary detective assigned to process the crime scene at the Meadowbrook Train Station with a team of detectives. Id. at 133. He responded to the scene at 9:30 a.m. Id. At the scene, near the victim's vehicle, he identified a pair of sneakers, a pool of blood about one foot by three feet, a bent serrated knife blade about two and three-quarter inch, a broken knife blade, and blood extending from the blood pool to 16 to 20 feet to the victim's body. Id. at 139 – 140, 145, 150 - 151. The victim's RAV4 was still running when Lieutenant Schikel arrived at the scene. Id. at 149. The driver's door was completely open and the driver's side rear door was somewhat open. Id. The detective found a knife inside the RAV4 vehicle. Id. at 146. It was a Ginsu style knife with an eight inch blade, and it was bloodstained. Id. at 146, 148. A knife handle with a small portion of the blade attached was found underneath the victim's body. Id. at 153 – 154. The knife handle with the partial blade looked to be from the same knife as the broken blade found in the pool of blood. Id. at 155 – 156.

Detective Terrance Lewis of the Montgomery County Detective Bureau – Forensic Services Unit testified that on July 27, 2020, he was assisting Lieutenant Schikel, and after he assisted at the crime scene, he went to 8507 Ferndale Street to photograph and recover any evidence. (N.T., Trial by

6

Jury – Day 2, 9/28/21, pp. 8 – 9). Inside the home he recovered a knife block, manufactured by Ginsu. Id. at 11. Detective Lewis noted that several knives from the knife block were missing, there were empty slots when he found it. Id. at 12 – 13. The knives from the scene are also labeled with "Ginsu." Id. at 14. The detective processed the exterior of Appellant's white Jeep for evidence, and found several locations of blood stains. Id. at 15, 17. He also processed the interior Jeep pursuant to a search warrant, where he also found several locations of blood stains Id. at 17. Further, Detective Lewis processed the victim's vehicle. Id. at 21. There was blood on the front passenger interior door, front passenger seat, by the glove compartment, handle area of the front passenger door. Id. at 23 – 24.

Detective William Mitchell of the Montgomery County Detective Bureau, testified as an expert in the field of historical call detail record analysis. Id. at 32 – 34. The victim's phone was recovered from her vehicle by police. Id. at 45. Appellant's cell phone was recovered from his person at the hospital. Id. at 47. Detective Mitchell requested subscriber information the victim's phone and Appellant's phone from February 1, 2020 through July 28, 2020. Id. at 42, 46. He also downloaded the phones. Id. at 45. He further issued search warrants for the social media companies, Facebook, Instagram, and Snapchat that were relevant to the investigation. Id. at 52. Detective Mitchell read out some of these texts and social media app messages indicating that as of June 19, 2020, the victim wanted to end the relationship, and that as of June 20, 2020 they were no longer together as a couple. Id. at 56, 58.

7

However, the texting and messaging through the various apps continued in the following days. These messages revealed that their relationship at that point and at the time prior to the break-up was tumultuous and that there was a lot of arguing and name calling between them. Id. at 58, 61. They further showed that Appellant was having a difficult time accepting the break up. Id. at 60, 61, 65, 67 - 73. In particular, on June 20, 2020, starting at about 11:43 p.m., there was a volley of text messages in which Appellant told the victim, "Okay. Well, I'm not your pet, so fuck off. I hope you honestly die at this point. Like I just want to stab you in the neck continuously. I might actually to be honest. Have your head on a swivel constantly." Id. at 61. Starting on July 5, 2020 at 4:16 a.m. and continuing through the following day, Appellant texted his mother in part as follows:

> Defendant: "Did she send them to you? I just won't do it. I wanna stab this girl in the fucking neck, dude."
>
> Mother: "Gil."
>
> Defendant: "If she doesn't come back to me, mark my words, I'm going to do everything in my power to shit on her life."
>
> ***
>
> Defendant: "Mom, please. I'm so down. Stop talking to dad about it. She isn't going to unblock me. I think she's done for real. That can't happen."
>
> ***
>
> Defendant: "Okay. That's fine. I'm hurt. Just let me be for a few days. Mom, you better text her and tell her to see me face to face so I know it's for real. Or there's gonna be problems. I'm not doing this."

8

Mother: "Gil, I'll text her. But if she says it's over, you need to move on."

Defendant: "Okay. That's fine. Say all he wants to do is either text him or see him face to face and say it's for real. I'm never giving anyone a chance."

Mother: "I'll tell her you want to talk to her and won't fight. But if you start fighting with her and acting like an asshole, she will just block you again."

Defendant: "Okay. That's fine. I haven't wanted to fight. I just want her back. All I want. If she can't do that, then I'll never talk to her again." That simple."

Id. at 76 – 79. On July 6, 2020, the text conversation continues:

Defendant: "Because I want to talk to her. Say he will text you when you get home. Just unblock him. She's got an attitude like it's really done. I'm really gonna fucking kill her dude. I will stab her in the neck 57 times."

Id. at 80. Appellant's mother replied, "See. Now you're already getting aggressive." Id.

Defendant: "I won't act like that when we text. But just know if she does this for real, then shows up to our house one day, I'm shoving her face-first into the cement. Wasted a whole year. I could have been doing some other shit."

Id. Following that exchange, there are several phone calls from Appellant's mother's phone to the victim's phone, all of which went unanswered. Id. at 80 – 81.

9

On July 8, 2020, the victim initiated contact with Appellant. Id. at 81. In that text conversation, the victim states that she wants to return some of his possessions to him. Id. at 84 – 85. He agrees that he wants them back, and proposes Sunday to meet up. Id. at 85. On July 13, 2020, Appellant and the victim had a text conversation, in part where they are arranging for the victim to drop the items she had off at his house later that day, which Snapchat location information confirmed that the victim did in fact stop by his house. Id. at 88, 89 - 90. There was additional text conversation on July 17, 2020. Id. at 90 – 91.

A day before the murder on July 26, 2020, there was a series of communications, in which, in part, at 9:25 p.m. Appellant sent a photograph to his mother of the victim with her new boyfriend. Id. at 94. A minute later, Appellant texted the victim about her having a new boyfriend. Id. at 95. Appellant was upset that she had moved on. Id. At 9:26 p.m. Then the following conversation ensued:

> Defendant: "When can we meet in person?"
>
> Morgan: "When do you want to?"
>
> Defendant: "Up to you. So you have no desire of even thinking about getting back with me? Tomorrow I'm going to the field near your house."
>
> Morgan: "Okay. What time?"
>
> Defendant: "Can I ask a question?"
>
> Morgan: "What?"

10

Defendant: "Did you have sex with him? Just be honest. And whatever time you are available."

Morgan: "None of your business."

Defendant: "So you did. That's disgusting, Morgan."

Morgan: "Didn't say that."

Defendant: "We will talk tomorrow. What time?"

Morgan: "7:30?"

Defendant: "In the morning?"

Morgan: "Yeah."

Defendant: "How about 10:00. So did you have sex with him? Just be honest with me. I'll be there at ten o'clock."

Morgan: "I'll be there at 7:30. Take it or leave it."

Defendant: "Okay. Can you just answer the question."

Morgan: "What does that matter."

Defendant: "Because it does. Can you just tell me the truth."

Morgan: "Then there's no need to meet tomorrow."

Defendant: "Why? I'll be there at 7:30."

Morgan: "How the fuck did you find my VSCO?"

Defendant: "I been knew it. I was on it. I was really working on myself for you, too. I guess that's out of the picture now."

Morgan: "You should have been working on yourself for yourself, not for me. It's not healthy at all."

Defendant: "You in love with this guy?"

Morgan: "No."

Defendant: "Do you love me?"

Morgan: "I still care about you and you will always always have a place in my heart."

Defendant: "So you would never be able to have me as your lover again? I really don't get it."

Defendant: "I will be there at 7:30."

Defendant: "Answer the question."

Morgan: "Nevermind about tomorrow. You and your mother need to stay the fuck out of my life. You need to never contact me ever again. I'm blocking you."

Id. at 95 – 98. During this time in the text conversation, there was a Facebook message from Appellant's mother to the victim's Facebook page via Facebook messenger. Id. at 98.

Defendant: "No. I want to meet tomorrow. Relax. I'll be there at 7:30."

Morgan: "No, I'm done. You and your mother need to leave me the fuck alone."

Defendant: "Take my mom of the picture. I'll see you tomorrow at 7:30."

Morgan: "No. Fuck you. Leave me alone."

Defendant: "I'll be there at 7:30, Morgan. Relax."

12

Morgan: "No. Fuck off."

Defendant: "She did this, not me. I'll be there at 7:30."

Morgan: No. Fuck off, dude. You both can leave me the fuck alone and stay the fuck out of my life. I have been so fucking happy with my life. Leave me alone."

Defendant: "I didn't tell her to text you. I really didn't. I'll be there at 7:30."

Morgan: "Even in our fucking relationship, you told her everything. You have her get the fuck involved. You all leave to leave me alone and stay the fuck out of my business."

Defendant: "Just relax. You literally want to come talk to me about this. Cut my mom out of this. She is crazy."

Morgan: "No, I'm done, dude. I wanted to talk in person because it was respectful, but now I don't care."

Defendant: "Can you tell me what we would've talked about, how you found someone better? I want to talk in person one last time out of respect without my mom involved. The least you can do."

Morgan: "No. Your mom ruined that, just like she ruined your chance."

Defendant: "I know she did."

Morgan: "Have a nice one, Gil. I wish you the best, but you gotta leave me the fuck alone."

Defendant: "I want to see you tomorrow in person one last time to talk. Just please do that for me."

Morgan: "No."

Defendant: "Why?"

Morgan: "You mom ruined that."

Defendant: "It would be just me there, not her. You weren't coming back anyway. I just want to talk. So if she wasn't harassing you, you probably would have come back? Just meet me there at 7:30."

Defendant: "I had one last thing to give you anyway. Is that okay? The least you can do, Morgan."

Morgan: "No. I'm a piece of shit. I'm a coward. I'm disgusting. I'm good, but thanks."

Defendant: "I just flipped out on my mom. I told her I will never forgive her. So get my mom out of it. It's just between me and you. I'll see you at 7:30."

Morgan: "No. I don't care. Your mom involved herself too much at this point pint. Sorry, Gil, but you I'm not meeting you tomorrow."

Defendant: "I don't think of you as any of that. I'll drive to you."

Morgan: "No. Please don't."

Defendant: "Morgan, seriously."

Morgan: "What. Your mom is beyond disrespectful. She crossed the line too many times."

Defendant: "That just shows you don't care about me because I gave you a whole year. Get her out of the picture. I just want to talk to you. I don't claim my mom."

Morgan: "How can I get her out of the picture? She fucking involves herself and you involved her."

14

Defendant: "I didn't. I just told her because she kept asking me how it was going because she saw how hurt I was. Just get her out of the picture and meet me tomorrow.

Defendant: "I gave you everything I got. Least you can do is see me tomorrow."

Morgan: "Nah, sorry. You and her kinda put her in the picture."

Defendant: You really like this kid more than me? What were you saying to him about me today? That was the kid you were FaceTime though. I'll see you tomorrow at 7:30 at the filed or your house."

Morgan: "I never FaceTime some kid though. I told you that."

Defendant: "So you have more feelings for this kid than me?"

Morgan: "Met this kid after we were done."

Defendant: "He makes you happier? We meeting tomorrow or no? I want to talk to you in person."

Morgan: "He makes me happy, yes."

Defendant: "It's the mature thing to do."

Morgan: "Fine, Gil."

Defendant: "Okay. Happier than me? Nevermind. We will talk about it tomorrow at 7:30. I'll see you there."

Morgan: "You gonna tell you mom everything, too?"

Defendant: "No, I won't. She just asked how it was going. I said she found someone new. That's all. That's who I went to when I was in pain, but not anymore."

15

Morgan: "Probably will, cracking the fuck up."

Defendant: "I won't."

Morgan: "Yeah. Whatever. Just saying she makes herself look like this immature mom, so."

Defendant: "She doesn't need to know anything. She knows you will never come back to me. It doesn't matter. I told her I'm done with her."

Morgan: "I always liked her and respected her. I don't know why she thinks it's okay to disrespect me."

Defendant: "She ruined the best thing that happened to me. So she ruined us? Like even if there was some way for yous to get along."

Morgan: "I'm very much done."

Defendant: "Nevermind. We will talk about it tomorrow. That's fine."

Id. at 98 – 104.

On July 27, 2020, the day of the murder, there was additional phone activity between Appellant and the victim. Starting at 6:52 a.m., the victim texted Appellant but could not get ahold of him. Id. at 105 – 106. At 7:34 a.m., Appellant texted her stating, "I'm sorry. I fell asleep. I'll be there soon. I'm coming now. Please."

Morgan: "You have until 45. Then I'm leaving."

Defendant: "Church parking lot."

Morgan: "At the track."

16

Defendant: "Nah, church more private. This is in person. In person."

Morgan: "Fine. You have nine minutes. Four minutes."

Defendant: "Red light. Nothing I can do. I'm almost there. Relax. Just please stay. I already halfway there. Going under the bridge now."

Id. at 106. Morgan sent another text stating that there is another car at the church location. Id. at 108. Defendant suggested going to a more private place, and then they decided to go to the train parking lot. Id. at 108 – 109. According to cell site location, Morgan was at the train station at 7:55 a.m. Id. at 110. The last activity from the victim's phone was at 8:06 a.m., when she called her mother, but the call did not go through. Id. at 110 – 111. The 9-1-1 call occurred at 8:12 a.m. Id. at 111.

At 8:51 a.m., Appellant texted his mother, "Mom, I killed Morgan about an hour ago." Id. at 115. Appellant explained, "I constantly had sick thoughts in my head. I couldn't do it anymore. I love you guys so much. I had the biggest heart, no brains. That was the problem. You guys couldn't do anything else." Id. His mother was in disbelief, to which Appellant responded, "I'm sick in the head. There was no stopping me." Id. at 116. At 9:06 a.m., Appellant texted, "Mom, I stabbed her repeatedly." Id. at 117.

On cross-examination, Detective Mitchell acknowledged that on July 17, 2020, Appellant had sent several text messages expressing suicidal thoughts. Id. at 133 – 137. After Detective Mitchell's testimony, the Commonwealth rested its case.

17

The defense presented numerous character witnesses, including, Richard McCollick, Harry Dumas, David Hoftiezer, Wilton Benson, Charles McCormick, Gilbert Newtwon, Jr. (Appellant's father), and Judy Newton. Id. at 140 - 149.

Next, Appellant testified on his own behalf. Id. at 151. He testified that he wanted to meet up with the victim because he wanted to see if she really cared about him, and to find out whether she was sleeping with another man. Id. at 151. He explained that if she was sleeping with another man he was going to kill himself, in front of her. Id. He wanted to see if she would intervene as a test of whether she cared. Id. at 151 – 152. It was his plan to stab himself in the neck as many times as he could. Id. at 152. Appellant testified that he brought two kitchen knives with him, and that he just grabbed them right before he left his house. Id. He put them in the pouch of his hoodie. Id. When Appellant and the victim both arrived at the train station, he got into her car, and they started to talk. Id. at 153. Appellant admitted that at that time he loved the victim, and that he was upset. Id. at 154. The victim had a bag with items belonging to Appellant, so she exited the front driver's side and opened the rear driver's side door to retrieve the bag. Id. at 155. That is when Appellant pulled the knives out, and placed them on both sides of his legs. Id. Appellant asked her if she with the other guy and Appellant explained the victim's response as follows:

> She said - - she said she was definitely sleeping with
> him and she was definitely trying to start something
> new with him , and that she kind of - - you know, she

18

kind of chuckled at me because, once that was said, I asked her, Like why? Like why is this happening? I thought we were supposed to be together forever and that we were both - - we both came into the relationship as virgins because it was just so - - it's just so hard to find someone nowadays that hasn't been dating around. So it was just like - - it felt like it was meant to be and we both really cared for each other. And I just - - she said that it was hilarious that I thought that that was the truth, that we were both virgins for each other, and that she had lots of sex before she dated me and that she was going to have a lot of sex after she was done with me.

Id. at 157. Appellant testified that this made him really upset and that the anger started to kick in after hearing this. Id. He called the victim a fucking whore. Id. at 158. The victim turned and smacked and spit on him. Id. Appellant explained the effect this had on him, testifying, "And it just got to the point where I just - - as soon as she slapped me and spit on me, I just - - it went through my mind like - - like she must really not care about me. And I just - - I got so upset that I grabbed the knife and I just starting stabbing her." Id. After Appellant's cross-examination, the defense rested. Id. at 164 – 182. The defense concluded its evidence.

After the jury was excused, defense counsel asserted that the jury should be instructed on voluntary manslaughter. Id. at 186. The Commonwealth rejected this argument. Id. at 187. This Court denied the request and provided reasons for the denial on the record. Id. at 188 – 189.

At the start of the third day of trial, defense counsel requested that this Court reconsider its ruling on the voluntary manslaughter jury instruction,

19

citing to <u>Commonwealth v. Locks</u> and <u>Commonwealth v. Marks</u>. (N.T., Trial by Jury – Day 3, 9/29/21, p. 3). This Court having reviewed these cases, reaffirmed its ruling, and provided additional reasons for the denial on the record. <u>Id.</u> at 4-6.

At the conclusion of the trial, the jury returned a verdict of guilty of first-degree murder and possession of an instrument of crime. Id. at 69. Appellant proceeded immediately to a sentencing hearing. Id. at 71. Appellant was sentenced to a life term of imprisonment. Id. at 101.

On October 6, 2021, a timely post-sentence motion was filed, and denied. A timely direct appeal was not filed. On January 4, 2022, a petition seeking post-conviction relief pursuant to the Post-Conviction Relief Act, 42 Pa.C.S. §§ 9541-9546, was filed requesting the reinstatement of Appellant's direct appeal rights, which was granted on January 6, 2022. Accordingly, a notice of appeal was filed that same day.

<u>ISSUE</u>

This Court issued an order directing Appellant to provide a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant submitted the following issue as stated verbatim below:

> 1. Did the lower court err in denying appellant's request for a voluntary manslaughter – heat of passion jury instruction.

See, Concise Statement of Errors Complained of on Appeal, filed 1/28/22.

20

## DISCUSSION

### I. Voluntary Manslaughter Jury Instruction

On appeal, Appellant contends that this Court erred in denying his request to instruct the jury on voluntary manslaughter. For the reasons that follow, this Court properly denied the request and this issue should be rejected as meritless.

The relevant inquiry for an appellate court when reviewing a trial court's failure to give a jury instruction is whether such charge was warranted by the evidence in the case. Commonwealth v. Baker, 963 A.2d 495, 506 (Pa. Super. 2008) (citations omitted). Additionally, the Pennsylvania Superior Court has stated:

> In reviewing a challenge to the trial court's refusal to give a specific jury instruction, it is the function of this Court to determine whether the record supports the trial court's decision. In examining the propriety of the instructions a trial court presents to a jury, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal.

21

Id. at 507 (quoting Commonwealth v. Brown, 911 A.2d 576, 582-583 (Pa.Super. 2006)).

With respect to a "heat of passion" voluntary manslaughter instruction, the Pennsylvania Supreme Court has explained:

> A voluntary manslaughter instruction is warranted only where the offense is at issue and the evidence would support such a verdict. To support a verdict for voluntary manslaughter, the evidence would have had to demonstrate that, at the time of the killing, [the] appellant acted under a sudden and intense passion resulting from serious provocation by the victim. If any of these be wanting-if there be provocation without passion, or passion without a sufficient cause of provocation, or there be time to cool, and reason has resumed its sway, the killing will be murder.

Commonwealth v. Sanchez, 82 A.3d 943, 979-80 (Pa. 2013) (internal quotation marks and citations omitted).

"Heat of passion" includes emotions such as anger, rage, sudden resentment or terror which renders the mind incapable of reason. An objective standard is applied to determine whether the provocation was sufficient to support the defense of 'heat of passion' voluntary manslaughter. The ultimate test for adequate provocation remains whether a reasonable man, confronted with this series of events, became impassioned to the extent that his mind was incapable of cool reflection. Commonwealth v. Miller, 987 A.2d 638, 650 (Pa. 2009) (internal quotation marks and citations omitted).

A trial court must make an initial determination whether sufficient evidence has been presented of serious provocation. See Commonwealth v.

22

Carter, 466 A.2d 1328 (Pa. 1983) (where evidence does not support finding of manslaughter, court need not submit issue to jury); Commonwealth v. Dews, 239 A.2d 382 (Pa. 1968) (where no evidence of manslaughter, it is proper to refuse to submit manslaughter issue to jury); Commonwealth v. Carr, 580 A.2d 1362, 1364 (Pa.Super. 1990). Our Supreme Court has made clear that "a trial court shall only instruct on an offense where the offense has been made an issue in the case and where the trial evidence reasonably would support such a verdict. Therefore, only where an instruction is requested and only if the evidence supports 'heat of passion' voluntary manslaughter, is an instruction thereon required." Commonwealth v. Browdie, 671 A.2d 668, 674 (Pa. 1996); see also Commonwealth v. Solano, 906 A.2d 1180, 1190 (Pa. 2006) ("a trial court should not instruct a jury on legal principles which bear no relationship to the evidence presented at trial").

At the end of the second day of trial, defense counsel asserted that the jury should be instructed on voluntary manslaughter. Id. at 186. He argued that there was enough evidence from which a jury could reasonably convict Appellant of voluntary manslaughter. Id. Defense counsel further argued that it was a question of fact for the jury, whether Appellant had sufficient legal provocation without a sufficient time to cool. Id.

The Commonwealth rejected this argument, arguing that for a defendant to get this instruction, there must be adequate provocation, and that words of insulting or slanderous nature are not enough to meet this burden. Id. at 187. The Commonwealth asserted that the Superior Court has upheld as

23

insufficient provocation minor scuffles and disputes over trivial matters and small debts. Therefore the Commonwealth concluded that as a matter of law the victim smacking and spitting on Appellant is not adequate provocation, that it is instead a trivial matter. Id.

The Court denied the defense request for the instruction and explained its reasons on the record as follows:

> THE COURT: Please be seated. I'm looking at the question of whether a voluntary manslaughter instruction is warranted by the evidence. An objective standard is applied to whether or not there was serious provocation by Morgan McCaffery to support a heat of passion instruction. There are cases that use the following language: "In numerous cases, evidence showing a history of minor disputes and allegations of past infidelity has been held not to be sufficiently provocative to reduce murder to manslaughter, citing Commonwealth v. Frederick holding that evidence of a stormy relationship and of an argument between defendant and his victim earlier in the day of the killing was not sufficient. Evidence of provocation would require a heat of passion jury instruction."
>
> Another case talks about the cumulative effect of the defendant's stormy relationship. This is mason, M-A-S-O-N. "The cumulative effect of defendant's stormy relationship with the victim and revelations of infidelity that occurred in the parties' relationship did not qualify as a heat of passion defense evidence where defendant did not specifically assert at the time of the killing that has caused him to act."
>
> I find that the slap and the splitting taken with the words and history of the relationship does not support a voluntary manslaughter instruction as a matter of law. I, therefore, will not give the instruction.

24

Id. at 188 – 189.

At the start of the third day of trial, defense counsel requested that this Court reconsider its ruling on the voluntary manslaughter jury instruction, citing to Commonwealth v. Locks and Commonwealth v. Marks. (N.T., Trial by Jury – Day 3, 9/29/21, p. 3). This Court reviewed the cases, and stated its belief they are distinguishable. This Court noted that the Marks case involved a bench trial and the other case, involved a degree of guilty. Neither involved a jury. Id. at 4. Additionally, this court expanded on its reasoning in denying the requested jury instruction from the previous day as follows:

> So I would like to expand on my reasoning of yesterday citing McCuster, M-c-C-u-s-t-e-r, the ultimate test for adequate provocation remains whether a reasonable man confronted with this series of events became impassioned to the extent that his mind was incapable of full reflection.
>
> As I said yesterday, I don't believe a reasonable person confronted with these facts and events would elect to kill somebody. Clearly, there was passion involved here, but the passion is not the ultimate test for the judge to determine because that's a subjective - - you're looking at subjectively what is in the defendant's mind. So it's clear there was passion, but whether the provocation is serious enough is a legal standard that the Court determines objectively.
>
> I would like to articulate further that this defendant basically at the time of the killing when he's on top of Morgan, and the first witness in the case appears on the scene, Juan Vasquez, this defendant immediately runs to his car, drives away at a high rate of speed, and successfully negotiates his way to his friend's house and then to him home. That shows a certain

25

amount of cool reflection, that he was not so impassioned that he could not reflect.

Furthermore, the Commonwealth has introduced into this case evidence that the defendant made statements by text messages that show his premeditation and specific intent to kill. I'm not going to quote all of them, but "I'm really going to kill her," I believe he said to his mother, "I will stab her in the neck 57 times." Well, he went to the encounter with the victim armed with a deadly weapon, two knives. He never did use it on himself. He only used it on Morgan McCaffery in a similar way that he described to his mother.

So I think his mind was capable of cool reflection. There was indeed passion present, but the provocation was not serious enough in the objective standard to go to the jury.

Id. at 4 – 6.

In this case, Appellant and the victim had a tumultuous relationship around the time of the break-up and through the time leading up to the murder as demonstrated by the texts conversations and social media messages introduced at trial dating from June 19, 2020, up until right before the victim was murdered. In addition, according to Appellant's testimony, immediately prior to the murder he and victim had a conversation in which the victim said things that were hurtful to him, she smacked and spit on him. Taking all of this evidence together, it is not sufficient to warrant an involuntary manslaughter jury instruction. Our case law holds that evidence that the defendant and the victim had a difficult relationship and had argued on the day of the killing was insufficient to warrant a voluntary manslaughter instruction. See, Commonwealth v. Frederick, 498 A.2d 1322, 1325 (Pa .1985);

26

see also, Commonwealth v. Walters, 431 Pa, 74, 244 A.2d 757 (1968) (holding that there was insufficient evidence that defendant killed in heat of passion after the victim argued with and cursed at the defendant prior to the murder); Commonwealth v. Cisneros, 113 A.2d 293, 296 (Pa. 1955) (wife's racial slurs to husband emphasized by sticking her finger at his shoulder was insufficient provocation).

The cases cited by the defense in support of providing the jury instruction, Commonwealth v. Locks, 2014 WL 10788850 (Pa.Super. filed Nov. 14, 2014) (memorandum decision) and Commonwealth v. Marks, 704 A.2d 1095 (Pa.Super. 1997), are inapplicable because neither dealt with whether to provide jury instructions on voluntary manslaughter. In Locks, the trial court was faced with a degree of guilt hearing, and on appeal the defendant challenged the determination of the trial court of third-degree murder and not voluntary manslaughter. Id. at *3. In Marks, it was a non-jury trial, and at issue on appeal was the sufficiency of the evidence, and whether the evidence supported a verdict of voluntary manslaughter. Id. at 1099.

For these reasons and those set forth on-the-record at trial, the request for voluntary manslaughter jury instructions was properly denied.

27

CONCLUSION

Based upon the foregoing analysis, Appellant's judgment of

sentence entered on September 29, 2021, should be affirmed.

BY THE COURT:

WILLIAM R. CARPENTER      J.
COURT OF COMMON PLEAS
MONTGOMERY COUNTY
PENNSYLVANIA
38TH JUDICIAL DISTRICT

**Copies sent on March 21, 2022
By Electronic Mail to:**

Robert Falin, Esquire, Deputy District Attorney, Chief of Appellate Division;
RFalin@montcopa.org

James Berardinelli, Esquire, Office of the Public Defender, Chief of Appellate Division;
JBerardinelli@montcopa.org

Denise S. Vicario, Esquire, Executive Director; opinions@montgomerybar.org

Paul DAnnunzio; PDAnnunzio@alm.com

**Copies sent on March 21, 2022
By First Class Mail to:**

Gilbert Newton, III #QN0221
SCI Camp Hill
P.O. Box 8837
2500 Lisburn Road
Camp Hill, PA 17001

Judicial Assistant

28